UNITED STATES of America, by Nicholas deB. KATZENBACH, Attorney General of the United States, Plaintiff,

v.

ORIGINAL KNIGHTS OF the KU KLUX KLAN, an unincorporated Association, et al., Defendants.

Civ. A. No. 15793.

United States District Court
E. D. Louisiana,
New Orleans Division.

Dec. 1, 1965.

————◆————

Before WISDOM, Circuit Judge, and CHRISTENBERRY and AINSWORTH, District Judges.

WISDOM, Circuit Judge:

This is an action by the Nation against a klan.*

The United States of America asks for an injunction to protect Negro citizens in Washington Parish, Louisiana, seeking to assert their civil rights. The defendants are the "Original Knights of the Ku Klux Klan", an unincorporated association, the "Anti-Communist Christian Association," a Louisiana corporation, and certain individual klansmen, most of whom come from in and around Bogalusa, Louisiana.[1]

■ The defendants admit most of the allegations of the complaint. Their legal position is that a private organization and private persons are beyond the reach of the civil rights acts authorizing the Attorney General to sue for an injunction. There is no merit to this contention.

■ Seeking refuge in silence and secrecy, the defendants object to the admission of any evidence as to klan activities. We hold, however, that what the klan is and what the klan does bear signifi-

cantly on the material issues and on the appropriate relief.

■ In deciding to grant the injunction prayed for, we rest our conclusions on the finding of fact that, within the meaning of the Civil Rights Acts of 1957 and 1964, the defendants have adopted a pattern and practice of intimidating, threatening, and coercing Negro citizens in Washington Parish for the purpose of interfering with the civil rights of the Negro citizens. The compulsion within the klan to engage in this unlawful conduct is inherent in the nature of the klan. This is its ineradicable evil.

■ We find that to attain its ends, the klan exploits the forces of hate, prejudice, and ignorance. We find that the klan relies on systematic economic coercion, varieties of intimidation, and physical violence in attempting to frustrate the national policy expressed in civil rights legislation. We find that the klansmen, whether cloaked and hooded as members of the Original Knights of the Ku Klux Klan, or skulking in anonymity as members of a sham organization, "The Anti-Communist Christian Association", or brazenly resorting to violence on the open streets of Bogalusa, are a "fearful conspiracy against society * * * [holding] men silent by the terror of [their acts] and [their] power for evil".[2]

As early as 1868 General Nathan Bedford Forrest, the first and only Grand Wizard of the original Invisible Empire, dismayed by mounting, uncontrollable violence laid to the klan, ordered the klan to disband and directed klansmen to burn their robes and hoods.[3] General Forrest was a Confederate cavalry hero, a man without fear and, certainly to most Southerners, a man beyond reproach. He an-

---

* Although this order is cast in the form of an opinion, it represents the Court's findings of fact and conclusions of law.

1. Counsel for the individual defendants take the position that the defendant klan does not exist. The proof shows that the klan continues to exist and to function as a klan in the benign name of the "Anti-Communist Christian Association". See Section II, A of this opinion.

2. Report of the Joint Select Committee to Inquire into the Condition of Affairs in the Late Insurrectionary States (Wash. 1872), p. 28 (Majority Report.)

3. Testimony of General Forrest before the Joint Select Committee. Note 2, p. 6–14, 449–51.

nounced that he would dissociate himself from all klansmen and cooperate with public officials and the courts in enforcing law and order. But the founders of the Invisible Empire had sown dragon's teeth.

The evil that led General Forrest to disband the original Ku Klux Klan was its perversion of purposes by undisciplined klans led by irresponsible leaders.[4] The evil we find in the Original Knights of the Ku Klux Klan is an absolute evil inherent in any secret order holding itself above the law: "the natural tendency of all such organizations * * * to violence and crime."[5] As history teaches, and as the defendants' admissions and the proof demonstrate in this case, violence and crime follow as the night the day when masked men conspire against society itself. Wrapped in myths and misbeliefs which they think relieve them of the obligations of ordinary citizens, klansmen pledge their first allegiance to their Konstitution and give their first loyalty to a cross in flames.

None of the defendant klansmen is a leader in his community. As a group, they do not appear to be representative of a cross-section of the community. Instead they appear to be ignorant bullies, callous of the harm they know they are doing and lacking in sufficient understanding to comprehend the chasm between their own twisted Konstitution and the noble charter of liberties under law that is the American Constitution.

■■ Legal tolerance of secret societies must cease at the point where their members assume supra-governmental powers and take the law in their own hands. We shall not allow the mis-

guided defendants to interfere with the rights of Negro citizens derived from or protected by the Constitution of the United States and now expressly recognized by Congress in various civil rights statutes. We enjoin the Original Knights of the Ku Klux Klan, its dummy front, the Anti-Communist Christian Association, and the individual defendants from interfering with orders of this Court and from interfering with the civil rights of Negro citizens in Washington Parish. Specifically, these rights include:

(1) the right to the equal use and enjoyment of public facilities, guaranteed by the Fourteenth Amendment;

(2) the right to the equal use and enjoyment of public accommodations, guaranteed by the Civil Rights Act, 42 U.S.C. § 2000a;

(3) the right to register to vote and to vote in all elections guaranteed by the Fifteenth Amendment, by 42 U.S.C. § 1971, and by the Voting Rights Act of 1965; and

(4) the right to equal employment opportunities, guaranteed by the Civil Rights Act, 42 U.S.C. § 2000e.

## I.

■■ The United States sues under authority of 42 U.S.C. § 1971; 42 U.S.C. §§ 2000a–5 and 2000e–6. Under those sections and under 28 U.S.C. § 1345, this Court has jurisdiction of the action. We resolve any doubt as to the reach of these sections in favor of the Government's standing to sue in a case of this kind. In its sovereign capacity the Nation has a

---

4. In January 1869 General Forrest issued an order to disband which began "Whereas, the order of the Ku Klux Klan is in some localities being perverted from its original honorable and patriotic purposes * * *" Davis, Authentic History: Ku Klux Klan, 125–28, (N.Y. 1928); Carter, The Angry Scar, 216 (N.Y.1959).

5. "There is no doubt about the fact that great outrages were committed by bands

of disguised men during those years of lawlessness and oppression. The natural tendency of all such organizations is to violence and crime; hence it was that General Forrest and other men of influence in the state, by the influence of their moral power, induced them to disband." Report of the Joint Select Committee, Note 2, p. 463 (Minority Report.)

proper interest in preserving the integrity of its judicial system, in preventing klan interference with court orders, and in making meaningful both nationally created and nationally guaranteed civil rights.[6]

## II.

We turn now to detailed findings of fact.

A. *Background.* The invisible realm of the Original Knights of the Ku Klux Klan coincides with the Sixth Congressional District of Louisiana. This district is composed of the "Florida" parishes, the area east of the Mississippi River and north of Lake Pontchartrain claimed by Spain until 1810.[7] The events giving rise to this action took place in Washington Parish and centered in Bogalusa, the largest municipality in the Parish. Bogalusa is on the Pearl River at a point where the river forms the boundary between Louisiana and Mississippi. It has a population of about 14,000 white persons and 7,500 Negroes.

The Grand Dragon of the Original Knights of the Ku Klux Klan and President of the Anti-Communist Christian Association is Charles Christmas of Amite in Tangipahoa Parish. Saxon Farmer, who seems to have an uncanny capacity for being present whenever there is racial trouble in Bogalusa, is the second in command of both organizations, Grand Titan of the Klan and Vice-President of the Anti-Communist Christian Association. In February 1955 he was elected to both offices simultaneously. He is also the Exalted Cyclops of one of the Bogalusa Klaverns (local units). In 1960 this Court entered an order in the case of United States v. McElveen et als. (C.A.No. 9146) against Saxon Farmer and others enjoining them from interfering with the rights of Negro citizens to vote.[8] That order restored to voter registration rolls of Washington Parish the names of 1,377 Negro citizens Farmer and others, then active in the Citizens Council, had unlawfully purged from the rolls.

■ The evidence clearly establishes that the Anti-Communist Christian Association is not a bona fide, independent organization but is the defendant klan thinly disguised under a respectable title. At an earlier time, the klan's dummy organization was called the Bogalusa Gun Club. The defendants' efforts to appear respectable by association may also be reflected in the location of the klan's principal office in the Disabled American Veterans Hall.

■ The officers, members, internal structure, and method of paying dues of the ACCA and the klan are identical. The corporate structure of the ACCA includes nothing but a charter. The governing rules and by-laws of the ACCA are the Klan Konstitution. The secret oath for admission and resignation in both organizations is the klan oath. Nothing is required of klan members to become members of the ACCA, except identifying to the secretary of the klan unit their assigned secret klan number. Klan members are then furnished a small green card with the name Anti-Communist Christian Association printed thereon. This Court finds that the defendant

6. In United States v. Raines, 1959, 362 U.S. 17, 27, 80 S.Ct. 519, 526, 4 L.Ed. 2d 524 upholding the constitutionality of the Civil Rights Act of 1957 in a suit on behalf of private persons against public officials, the Court said: "It is urged that it is beyond the power of Congress to authorize the United States to bring this action in support of private constitutional rights. But there is the highest public interest in the due observance of all the constitutional guarantees, including those that bear the most directly on private rights, and we think it perfectly competent for Congress to authorize the United States to be the guardian of that public interest in a suit for injunctive relief."

7. The parishes of Washington, Tangipahoa, St. Tammany, St. Helena, Livingston, Ascension, East Feliciana, West Feliciana, East Baton Rouge, West Baton Rouge, Pointe Coupee, and Iberville.

8. Aff'd, sub. nom. United States v. Thomas, 1962, 362 U.S. 58, 80 S.Ct. 612, 4 L.Ed.2d 535.

klan has appeared in this cause. The pretense that the klan does not exist, has ceased to exist, or has made no appearance in this cause is a sham.

Until recently Washington Parish was segregated from cradle to coffin. After Congress adopted the 1964 Civil Rights Act, however, the Negroes in Bogalusa began a broad scale campaign to gain recognition of their rights. Working through the Bogalusa Voters League, they conducted voter registration clinics, held mass meetings to call attention to their grievances, picketed places of public accommodations to protest racially discriminatory policies, and petitioned the Mayor of Bogalusa to accord equal rights in voting, public facilities, employment, and education.

The klan has been the center of unlawful activity in Washington Parish designed to interfere with the efforts of Negro citizens to gain equal rights under the law. Its objective has been to preserve total racial segregation in Bogalusa.

B. *Defendants' Admissions.* An unusual feature of this litigation is the defendants' damning admissions. The defendants *admit* that the klan's objective is to prevent Washington Parish Negroes from exercising the civil rights Congress recognized by statute. In their pleadings, the defendants concede that they further their objective by—

(a) assaulting, threatening, and harassing Negroes who seek to exercise any of their civil rights, and assaulting, threatening and harassing persons who urge that negroes should exercise or be accorded those rights;

(b) committing, threatening to commit, and urging others to commit cats of economic retaliation against Negroes who seek to exercise these rights, and against any persons who urge that Negroes should exercise or be accorded these rights, or who permit open, free and public discussion on the issue;

(c) threatening and intimidating public officials and businessmen who accord or seek to accord Negroes their rights without regard to race or color.

The reason for the admissions was evident at the trial and is evident in the defendants' brief. The United States subpoenaed over a hundred witnesses and, no doubt, was prepared to prove every allegation in the complaint. Because of the defendants' admissions, the disputed issues were few and only a few witnesses were called. As a result, the klan avoided an airing of its activities that necessarily would have occurred had a large number of witnesses testified. Not content with the success of this maneuver, the defendants objected to the introduction of "any evidence pertaining to the activities of the Ku Klux Klan" on the grounds that (a) the klan had ceased to exist and (b) "delv[ing] into these unrelated matters" was solely "to expose" the Ku Klux Klan, an invasion of the "privacy and individual freedoms of all these defendants".

As indicated earlier, however, the nature of the klan's activities bears directly on the existence of a pattern and practice of unlawful conduct and also on the sort of decree that should be issued.

The Government subpoenaed membership lists and records of the klan. The defendants failed to produce these records and at the hearing explained that all of the records of the klan had been destroyed as a matter of klan policy after suit was filed. The Court ordered Christmas, Farmer, and John Magee, the treasurer, to compile from memory lists of officers and members. Counsel for the defendants objected to the admissibility of the lists for the reasons that: (1) there were no lists and records in the custody of the defendants; (2) the requirement was an invasion of the rights of privacy and association. The defendants did not rely on the Fifth Amendment privilege against self-incrimination; they relied on NAACP v. State of Alabama, 1958, 357 U.S. 449, 78

338

S.Ct. 1163, 2 L.Ed.2d 1488. The Court overruled the objections.

 NAACP v. State of Alabama does not support the defendants' position. In that case Justice Harlan, speaking for a unanimous Court, held that the rights of the members of the NAACP to pursue their lawful interests privately and to associate freely with others were protected by the 14th Amendment. Accordingly, the NAACP was relieved of the necessity of turning over its membership list to the State of Alabama. In reaching that decision the Court distinguished People of State of New York ex rel. Bryant v. Zimmerman, 1928, 278 U.S. 63, 49 S.Ct. 61, 73 L.Ed. 184, a case involving a New York Chapter of the Ku Klux Klan. A New York statute required any unincorporated association which demanded an oath as a condition to membership to file with state officials copies of its "constitution, by-laws * * * a roster of its membership and a list of its officers". In Zimmerman the Court found that the statutory classification was reasonable, because of the "manifest tendency on the part of one class to make the secrecy surrounding its purposes and membership a cloak for acts and conduct inimical to personal rights and public welfare. * * * 'It is a matter of common knowledge that this organization [the klan] functions largely at night, its members disguised by hoods and gowns and doing things calculated to strike terror into the minds of the people'". The Supreme Court reaffirmed this distinction in NAACP v. State of Alabama. Justice Harlan pointed out:

"[In Zimmerman] the Court took care to emphasize the nature of the organization which New York sought to regulate. The decision was based on the particular character of the Klan's activities, involving acts of unlawful intimidation and violence * * * of which the Court itself took judicial notice."

Here the defendants admit that the klan's methods are lawless. Albertson v. Subversives Activities Board, Nov. 15, 1965, 86 S.Ct. 194 pretermits the question at issue in Zimmerman and NAACP v. State of Alabama.

C. *Out of Their Own Mouths*. (1) The Konstitution of the Original Ku Klux Klan embodies "the Supreme Law of the Realm". Article I states that one of the objects of the organization is to "protect and defend the Constitution of the United States"; but another object is to "maintain forever Segregation of the races and the Divinely directed and historically proven supremacy of the White Race". The preamble reaffirms "the principles for which our forefathers mutually pledged and freely sacrificed their lives, their fortunes, and their sacred honor two centuries ago"; but Article II limits the membership to "mature, Native-born, White, Gentile Men * * * who profess and practice the Christian Faith but who are not members of the Roman Catholic Church".

(2) Printed with the Konstitution is a Proclamation stating that it must be "STRICTLY ADHERED TO." The Proclamation states that "ALL REALM work is carried on by a chain of command", establishes the organization along military lines, defines the duties of the various officers and committees, and describes "The Way of the Klavern".

"All Klaverns will have at least five armed guards with flashlights posted during regular meetings." However, "No one will be allowed to carry a gun inside the Klavern during regular meetings except the Knight Hawk (Keeper of the Klavern)."

A Klokan's (Klavern Investigator's) duty is "to investigate all questionable matters pertaining to the Klavern". "Any Klansman who is known to violate our rules, especially those that give information to any aliens [non-members] shall be expelled immediately, then is to be watched *and visited by the Wrecking Crew if necessary*". (Emphasis added.) Moreover, each klan unit "will set up at least *one team of six men to be used for wrecking crew.* These men should be appointed by the Klokan in secrecy". As judges charged with the duty of

drawing inferences from the demeanor of witnesses, we observed that a former klansman exhibited uneasiness for fear of klan reprisals, when questioned as to the function of the klan "wrecking crew". The defendants' testimony relating to the purpose and functions of the wrecking crew was evasive. There is no doubt however that the wrecking crew performed disciplinary functions and that the discipline could be severe.

(3) The Oath of Allegiance requires faithful obedience to the "Klan's Konstitution and Laws", regulations, "rulings and instructions of the Grand Dragon". "PROVIDENCE ALONE PREVENTING". Klansmen must swear "forever" to "keep sacredly secret . . . all . . . matters and knowledge of the . . . [one asterisk is Klanese for 'Klan'; four asterisks mean "Original Knights of the Ku Klux Klan] . . . [and] never divulge same nor even cause same to be divulged to any person in the whole world". As if this were not enough, the Oath also requires klansmen to swear that they "solemnly vow and most positively swear" never "to yield to bribe, threats, passion, punishment, persecution, persuasion, nor any inticements (sic) whatever . . . for the purpose of obtaining . . . a secret or secret information of the XXXX." Section IV on "XXXX ISHNESS" goes a little further. In this section of the oath the klansmen must swear to "keep secret to [himself] a secret of a man committed to him in the sacred bond of * manship. *The crime of violating this oath, treason against the United States of America, rape, and malicious murder alone excepted.*" (Emphasis added.) In pure klanese, the klansman pledges his "life, property, vote, and sacred honor" to uphold "unto death" the Constitution and *"constitutional* laws". (Emphasis added.) But he ends by swearing that he will "zealously shield and preserve * * * free segregated public schools, white SUPREMACY."

(4) The "Boycott Rules" give a good idea of the Klan's coercive tactics. For example:

"The Boycott Committee (one member from each local unit appointed by the Exalted Cyclops) shall have exclusive investigative authority and it shall not act at any time with less than three members present. * * (1) No person or subject upon whom a boycott shall have been placed shall be patronized by any member. * * * Boycotts shall be imposed upon subjects who are found to. be violating the Southern traditions. * * * Boycotts shall be placed upon all members of the Committee who publicly served with Bascom Talley in his efforts to promote the Brooks Hays meeting. Boycotts shall be placed upon any merchant using Negro employees to serve or wait upon persons of the white race. (Service Stations using Negroes to pump gas are excluded.)

Boycotts shall be placed against a subject who serves Negroes and whites on an integrated basis.

Boycotts shall be placed upon a subject who allows Negroes to use White rest rooms. * * *

No member shall be punished for violation of the rules by a member of his family under twelve (12) years of age.

Any member who shall after a hearing have been found guilty of personally patronizing a subject listed on the boycott list shall be *wrecked by the wrecking crew* who shall be appointed by the Committee. (Emphasis added.) * * *

Second offense—If a member is found guilty of personally violating the boycott list he shall be wrecked and banished from the Klàn."

It is not surprising that the attorneys for the United States had difficulty extracting from klansmen answers to questions.[9]

---

9. On two occasions, the Court found it necessary to warn the witnesses of the

penalty for perjury. The Court recessed the hearing to allow time for the wit-

(5) In keeping with its false-front and as bait for the devout, the Klan purports to perform its dirty work in the name of Jesus Christ. The first object stated in the "Objects and Purposes" clause of the Konstitution of this anti-Roman Catholic, anti-Semitic, hate-breeding organization is to "foster and promote the tenets of Christianity". The Proclamation requires the Kludd (Klavern Chaplain) to "open and close each meeting of the Klavern with prayer". Setting some kind of a record for sanctimonious cant, the Proclamation directs the Kludd to "study and be prepared to explain the 12th chapter of ROMANS at any time, as *this is the religious foundation of the Invisible Empire*". (Emphasis added)

Saint Paul, Apostle to the Gentiles, wrote his Epistle to the Romans in Corinth, midway between Rome and Jerusalem. Addressing himself to Jews and Gentiles, he preached the brotherhood of man: "Glory, honour, and peace, to every man that worketh good, to the Jew first, and also to the Gentile: For there is no respect of persons with God." [10] In the Twelfth Chapter of Romans, Paul makes a beautiful and moving plea for tolerance, for brotherly love, for returning good for evil:

9 Let love be without dissimulation. Abhor that which is evil; cleave to that which is good.

10 Be kindly affectioned one to another with brotherly love; in honour preferring one another; * * *

14 Bless them which persecute you: bless, and curse not. * * *

17 Recompense to no man evil for evil. Provide things honest in the sight of all men.

18 If it be possible, as much as lieth in you, live peaceably with all men.

19 Dearly beloved, avenge not yourselves, but rather give place unto wrath: for it is written, Vengeance is mine; I will repay, saith the Lord.

20 Therefore if thine enemy hunger, feed him; if he thirst, give him drink; for in so doing thou shalt heap coals of fire on his head.

21 Be not overcome of evil, but overcome evil with good."

These words must fall on stony ground in the Klaverns of a Klan.

D. *Specific Findings of Klan Intimidition and Violence.* We select the following examples of the defendants' acts of intimidation and violence.

(1) January 7, 1965, former Congressman Brooks Hays of Arkansas, at the invitation of religious, business, and civic leaders of Bogalusa, was scheduled to speak in Bogalusa at St. Matthews Episcopal Church Parish House on the subject of community relations. The meeting was to be open to both Negroes and whites and it was planned that seating would be on a racially non-segregated basis. After learning of the proposed appearance of Mr. Hays and the arrangements for an unsegregated meeting, the Klan and its members protested to the Mayor and the members of the Commission Council and, by means of threats of civil disorder and economic retaliation against local businessmen who supported the meeting, caused the withdrawal of the invitation to Mr. Hays to speak December 18, 1964, before the Hays invitation was withdrawn, the Mayor of Bogalusa and Police Commissioner Arnold Spiers, in an effort to head off possible civil disorder, appeared at a Klan meeting at the Disabled Veterans Hall. The show of force at this meeting by over 150 hooded Klansmen unquestionably intimidated public officials in Bogalusa and, later, hindered effective police action against Klan violence. On the stand, Mayor Cutrer admitted that *he*

nesses to refresh their recollection, and to find, if possible, any membership lists. On one occasion, a witness pleaded the 5th Amendment when, in a colloquy with the Court, it was apparent that he was afraid of klan reprisal for testifying as to klan records; he withdrew his plea of privilege and testified.

10. Romans, Chap. II, v. 10–11.

was *"frightened when he looked into 150 pairs of eyes"*.

(2) Since at least January 28, 1965, the defendants, including Saxon Farmer, Russell Magee, Dewey Smith, Randle C. Pounds, Billy Alford, Charles McClendon, James Burke, and other members of the defendant Klan, have made a practice of going to places where they anticipated that Negroes would attempt .to exercise civil rights, in order to harass, threaten, and intimidate the Negroes and other persons. For this purpose, members of the defendant Klan have gone to Franklinton, Louisiana, when Negro citizens of Washington Parish were expected to apply to register as voters, have gone to restaurants in Bogalusa when Negroes were seeking or were expected to seek service, and have gone to locations in downtown Bogalusa and near the Bogalusa Labor Temple when Negroes were attempting or were expected to demonstrate publicly in support of equal rights for Negroes.

(3) William Yates and Stephen Miller, two CORE workers, came to Bogalusa in January 1965. The Grand Dragon and Grand Titan of the Klan, defendants Charles Christmas and Saxon Farmer, appeared at the Mayor's office to ask the Mayor to send William Yates and Stephen Miller out of Bogalusa. Mayor Cutrer indicated that he could do nothing. The next day, February 3, 1965, three Klansmen, James Hollingsworth, Jr., James Hollingsworth, Sr., and Delos Williams, with two other persons, Doyle Tynes and Ira Dunaway, attempted to insure Yates' and Miller's departure. This group followed Yates and Miller and assaulted Yates.

(4) February 15, 1965, defendant Virgil Corkern, Klansman, and approximately 30 other white persons attacked by Negro citizens and damaged the car in which they were riding. This occurred because the Negroes had sought service at a gasoline station in Bogalusa. On that same day, Corkern and other persons gathered at Landry's Fine Foods, a restaurant in Bogalusa, to observe Negroes seeking service at the restaurant. Corkern and

one other entered the restaurant brandishing clubs, ordered the Negroes to leave and threatened to kill Sam Barnes, a member of the Bogalusa Voters League, who had come to the restaurant with six Negro women.

(5) March 29, 1965, defendants Hardie Adrian Goings, Jr., Klansman, and Franklin Harris, Klansman, shortly after meetings had been held at the Bogalusa Labor Temple, threw an ignited tear gas canister at a group of Negroes standing near the Labor Temple. Goings, Jr. then tried to disguise his car by repainting it and removing the air scoop from the top to prevent detection of this crime. Goings or other Klansmen used this same car in May of 1964 to burn a cross at the home of Lou Major, editor of the Bogalusa newspaper.

(6) April 7, 1965, defendants Lattimore McNeese and E. J. (Jack) Dixon, Klansman, threatened Negro citizens during the course of a meeting at the Labor Temple by brandishing and exhibiting a gun at Negroes standing outside the Labor Temple.

(7) April 9, 1965, defendants Billy Alford, Klansman, Randle C. Pounds, Klansman, Lattimore McNeese, Charles McClendon, and James Burke, Klansman, with other persons, went to the downtown area of Bogalusa where Negro citizens were participating in a march to the Bogalusa City Hall to protest denial of equal rights. Pounds, McClendon, and Burke, in a group, moved out to attack the marchers. Pounds assaulted the leader of the march, James Farmer, with a blackjack; McClendon and Burke were temporarily deterred from the threatened assault, but immediately thereafter assaulted a newsman and an FBI agent. Alford assaulted one of the Negroes participating in the march.

(8) May 19, 1965, Virgil Corkern, Klansman, two sons of Virgil Corkern, and other white persons went to Cassidy Park, a public recreation area maintained by the City of Bogalusa, for the purpose of interfering with the enjoyment of the park by Negroes and white CORE workers who were present at the park

and using the facilities for the first time on a non-segregated basis. The Corkern group entered the park and dispersed the Negro citizens with clubs, belts, and other weapons.

(9) Negro members of the Bogalusa Voters League, unable to exercise their civil rights and also unable to obtain from police officials adequate protection from the Klan, filed suit June 25, 1965, in the case of Hicks v. Knight Civ.Ac. No. 15,727 in this Court. The complaint asks for an injunction requiring officers of the City of Bogalusa to open the public parks and to operate such parks without racial discrimination, and also requiring law enforcement officers of the City, Parish, and State to protect the Negro plaintiffs and other Negroes from physical assaults, beatings, harassment, and intimidation at the hands of white citizens. July 10, 1965, this Court issued an injunction in Hicks v. Knight enjoining certain city and parish law enforcement officers from failing to use all reasonable means to protect the Negro plaintiffs and others similarly situated from physical assaults and beatings and from harassment and intimidation preventing or discouraging the exercise of their rights to picket, assemble peaceably, and advocate equal civil rights for Negroes. The preliminary injunction is still in full force and effect. Even after this Court issued its order July 10, 1965, the defendant Klansmen continued to interfere with Negro citizens exercising civil rights and interfered with performance of the duties of law enforcement officials under the injunction in Hicks v. Knight.

(10) July 11, 1965, during a Negro march in downtown Bogalusa, defendants Randle Pounds, Klansman, H. A. Goings, Jr., Klansman, Franklin Harris, Klansman, and Milton E. Parker were present. Harris and Goings passed out 25–30 2 x 2 clubs to youths and Pounds stationed the youths along the march route. Parker was arrested by a City policeman along the route of march for disturbing the peace.

(11) Included in the exhibits are a number of handbills bearing the caption,

"Published by the Original Ku Klux Klan of Louisiana". These are crude, scurrilous attacks on certain Bogalusa citizens who advocated a moderate approach to desegregation. For example, in one handbill an Episcopal minister is accused of lying for having said that he had received calls threatening to bomb his church; the minister's son is said to be an alcoholic, to have faced a morals charge in court, and to have been committed to a mental institution. The handbill adds:

"The Ku Klux Klan is now in the process of checking on Reverend —————'s [naming him] moral standards. If he is cleared you will be so informed. If he is not cleared, you will be informed of any and all misdeeds or moral violation of his in the past."

In the same handbill the Klan announced that it was "boycotting businesses which cater to integration such as Mobile Gas Stations, etc." Mobile Gas Station is a business competitor of the defendant, Grand Titan Saxon Farmer.

All of the handbills attempt to intimidate public officials, the Governor of Louisiana, the Congressman from the Sixth District, the Mayor of Bogalusa, and federal judges (by name). Sometimes the attempted intimidation is by threat of violence, sometimes by character assassination. We quote, for example:

(a) "On numerous occasions we have been asked by local officials to refrain from any acts of violence upon this outside *scum* that has invaded our city. Being a christian organization, we have honored these requests each time. How much longer can we continue??? Contrary to what the liberal element would have you think, this memorandum is not the work of racist and hate mongers or trouble makers, as Governor 'Big John' McKeithen calls us. We are God fearing white, southerners who believe in constitutional government and the preservation of our American heritage.

"If your governor would have done the right thing to start with, he would have refused to protect these local and outside agitators and did just what one great southern governor did. He refused to protect this outside element, (CORE, NAACP, SNICK, ETC.), at the expense of his state. He chose, instead, to let LBJ and Katzenbach protect them. Only after the city of Bogalusa had spent $96,000, did he (Big John McKeithen), make any effort to ease the situation in this city."

(b) "As the people tried· to preserve our Southern way of life, the Mayor and Council were slowly selling the people out at every turn. The Mayor has repeatedly GIVEN in. James Farmer did not have the support of the local Negroes. Mayor Cutrer is not giving the city of Bogalusa to the negro citizens of Bogalusa. No. He is giving the city to James Farmer and a handful of Negro Teenagers. NO PRESSURE was put on James Farmer and Dick Gregory to keep them out of Bogalusa. Not by the Mayor, the State Representative, the State Senator, or Congressman Morrison. This was not so when the WHITE CONSERVATIVES wanted to stage a Rally. Pressure was exerted from all levels, even the invited guest speakers were 'leaned on'.

"The Governor, the Congressman, Jimmy Morrison, or his com-rats, Suksty Rayborn, and Buster Sheridan. John McKeithen asked for our vote and promised to serve the PEOPLE. We now ask, Big John, isn't this TRUE? What is happening under your administration?

"Here is the list of elected officials who COULD & AND SHOULD have helped the People of Bogalusa. All these should be tarred and feathered.

. MAYOR JESSIE CUTRER
REPRESENTATIVE . SHERIDAN
SENATOR SIXTY RAYBORN
SHERIFF DORMAN CROWE
CONGRESSMAN JIMMY MORRISON
GOVERNOR JOHN McKEITHEN
SENATOR RUSSELL LONG

"Now, the QUESTION. Why have these men, elected by the WHITE people turned their back on us in our time of need?

"Is Communism so close? Who bought them? Who bought their HONOR and FOR HOW MUCH?"
(c) "The Ku Klux Klan is strongly organized in Bogalusa and throughout Washington and St. Tammany Parishes. Being a secret organization, we have KLAN members in every conceivable business in this area. We will know the names of all who are invited to the Brooks Hayes meeting and we will know who did and did not attend this meeting. Accordingly, we take this means to urge all of you to refrain from attending this meeting. Those who do attend this meeting will be tagged as intergrationists and will be dealt with accordingly by the Knights of the KU KLUX KLAN."

■ E. *Summary of the Facts.* We find that the defendants have admitted and the proof has shown that they intimidated, harassed, and otherwise interfered with (1) Negroes exercising their civil rights, (2) persons encouraging Negroes to assert their rights, and (3) public officials, police officers, and other persons seeking to accord Negroes their rights. These acts are part of a pattern and practice of the defendants to maintain total segregation of the races in Washington Parish. The pattern creates an effect extending beyond the effect of any particular act or practice. A Negro who is clubbed in a publc park may fear to order coffee in a segregated sandwich shop or he may decide that it is the better part of valor not to exercise voting

rights. The owner of the sandwich shop who receives threatening calls for having served Negro patrons may conclude that taking care of his family comes ahead of hiring Negro employees. The intimidation or violence may be effective not only as to the particular individual against whom it is directed but also as to others who may be less courageous than the Negroes brave enough to parade in Bogalusa or register to vote in Franklinton. The acts of terror and intimidation admitted or proved in this case, acts characteristic of a masked, secret conspiracy, can be halted only by a broad order enjoining the defendants from unlawfully interfering with the exercise of civil rights by Negro citizens.

### III.

The defendants contend that the complaint fails to state a claim upon which relief can be granted. They start with the doctrine that the 14th and 15th Amendments apply only to state action or action under color of state law. A. This moves them to conclude as a matter of statutory construction, that Congress did not purport to enforce civil rights against private persons. Moreover, so they argue, the 1957 Act applies to interference with "voting" not to interference with "registering". B. And, they say, if civil rights acts do authorize enforcement against private persons (not owners or managers of a place of public accommodation) the statutes are unconstitutional.

### A.

(1) *The Civil Rights Act of 1957.* In the field of civil rights the problem of enforcement is more difficult than the problem of legislative definition. The choice of remedy determines whether an act of Congress simply declares a right or carries machinery for meaningful performance of the statutory promise. In the past, an obvious hiatus has been the lack of effective sanctions against private persons interfering with a citizen's exercise of a civil right. This lack may be explained by a number of reasons. (a) Congress has been reluctant to assert affirmatively by legislation its responsibility to protect the privileges and immunities of citizens of the United States, for fear of imperiling the balanced relationship between the states and the Nation.[11] (b) Courts have narrowly construed criminal sanctions available in Sections 241 and 242 of Title 18.[12] (c) Congress and the courts have been severely limited by the doctrine of state action, in spite of the trend toward an expansive view of what is state action.[13] (d) Congress has been wary of using an equitable remedy in civil rights legislation. The Constitution guarantees an accused in a criminal case the right to in-

11. See United States v. Cruikshank, 1875, 92 U.S. 542, 23 L.Ed. 588; Slaughter-House Cases, 1873, 16 Wall. 36, 21 L.Ed. 394.

12. In 1894 Congress repealed most of the provisions dealing with federal supervision of elections. Two general provisions for criminal sanctions were left standing: 42 U.S.C. § 241 (originally Section 6 of the Civil Rights Act of 1870, later Section 5508 of the Revised Statutes) providing criminal sanctions against conspiracies to deprive any citizen of any right secured by the Constitution and laws of the United States; and 42 U.S.C. § 242 (originally Section 2 of the Civil Rights Act of 1866, later Section 5510 of the Revised Statutes (1873), as amended in 1909, 35 Stat. 1092 by adding the word "wilfully") providing criminal sanctions against the deprivation of consti-

tutional rights, privileges, and immunities under color of state law. See United States v. Williams, 1951, 341 U.S. 70, 71 S.Ct. 581, 95 L.Ed. 758 restricting Section 241 to those cases in which the right allegedly violated is an incident to national citizenship. See also Screws v. United States, 1945, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 construing Section 242 as requiring specific intent to deprive a person of the right made specific by the Constitution or laws of the United States. Sections 241 and 242 are now before the Supreme Court again. United States v. Price, Nos. 59, 60, October Term, 1965; United States v. Quest, No. 65, October Term, 1965.

13. See Civil Rights Cases, 1883, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835; United States v. Reese, 1876, 92 U.S. 214, 23 L.Ed. 563.

dictment by a grand jury and trial by a jury of the vicinage. Enforcement of civil rights through the use of an injunction and the contempt power of the courts would by-pass the jury system.[14] However, in communities hostile to civil rights and resentful against "outside", that is, federal interference, injunctive relief may be the most effective method of enforcing civil rights.

Congress considered the pros and cons of these and many other issues when the Administration submitted an omnibus civil rights bill in 1956.[15] The focal issues—the contempt power, the jury system, and the relationship of the States with the Nation—produced one of the great debates in American parliamentary hitsory. By the time the bill was cut down to a voting rights law, as the Civil Rights Act of 1957, 71 Stat. 634, Congress and the country thoroughly understood the significance of the legislation.[16] Congress had opened the door, then near-

14. Hence the compromise affecting jury trials in the 1957 Act: criminal contempt cases arising under the act may be tried by district courts without juries, except where a person convicted is fined more than $300 or imprisoned for more than 6 months. 71 Stat. 638 (1957), 42 U.S.C. § 1995.

15. President Truman's Committee on Civil Rights submitted equally broad recommendations. See Report, To Secure These Rights, 151–161 (1947).

16. In a hearing before the House Judiciary Committee on the Civil Rights Bill, Attorney General Herbert Brownell explicitly explained the purposes and scope of the proposed amendments to Section 1971 of Title 42:

"The most obvious one of these defects in the law is that it does not protect the voters in Federal elections from unlawful interference with their voting rights by private persons—in other words, 1971 applies only to those who act 'under color of law' which means public officials, and the *activities of private persons and organizations designed to disenfranchise voters* in Federal or State elections on account of race or color are not covered by the present provisions of 1971. And so we say that the statute fails to afford the voters full protection from discrimination which was contemplated by the Constitution, especially the 14th and 15th amendments.

"Also this section 1971 is defective in another respect, because it fails to lodge in the Department of Justice and the Attorney General any authority to invoke civil remedies for the enforcement of voting rights. And it is particularly lacking in any provision which would authorize the Attorney General to apply to the courts for preventive relief against the violation of these voting rights.

"And we think that this is also a major defect. The ultimate goal of the Constitution and the Congress is the safeguarding of the free exercise of the voting right, acknowledging of course, the legitimate power of the State to prescribe necessary and fair voting qualifications. And we believe that civil proceedings by the Attorney General to stop any illegal interference and denial of the right to vote would be far more effective in achieving this goal than the private suits for damages which are presently authorized by the statute, and far more effective than the criminal proceedings which are authorized under other laws which, of course, can never be used until after the harm has been actually done.

"No preventive measures can be brought under the criminal statutes. So I think —and I believe you will agree with me—that Congress should now recognize that in order to properly execute the Constitution and its amendments, and in order to perfect the intended application of the statute, section 1971 of title 42, United States Code, should be amended in three respects:

"First, by the addition of a section which will prevent anyone, whether acting under color of law or not, from threatening, intimidating or coercing an individual in his right to vote in *any election*, general, special, or primary, concerning candidates for *Federal office*.

"And second, to authorize the Attorney General to bring civil proceedings on behalf of the United States or any aggrieved person for preventive or other civil relief in any case covered by the statute.

"And third, an express provision that all State administrative and judicial remedies need not be first exhausted before resort to the Federal courts." [Hearings before Subcommittee No. 5 of the Committee on the Judiciary, 85th Cong., 1st Sess., p. 570 (1957)]

ly shut, to national responsibility for protecting civil rights—created or guaranteed by the Nation—by injunction proceedings against private persons.

Part III of the Administration's bill, as originally proposed, would have authorized the Attorney General to file suit against any person who deprived or was about to deprive any citizen of any civil right. The compromise that became the Civil Rights Act of 1957 limits civil actions to protection of voting rights in special, general, or primary elections where federal officers are elected.

Before the 1957 Act, Section 1971 (now 1971(a)) was enforced either by an action for damages under 42 U.S.C. § 1983 and § 1985(3) or by a criminal action under 18 U.S.C. §§ 241, 242. The 1957 Act adds four subsections to Section 1971, including: [17]

> "(b) *No person, whether acting under color of law or otherwise*, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the office of President, Vice President, presidential elector, Member of the Senate, or Member of the House of Representatives, Delegates or Commissioners from the Territories or possessions, at any general, special, or primary election held solely or in part for the purpose of selecting or electing any such candidate.

> "(c) Whenever *any person* has engaged or there are reasonable grounds to believe that *any person*

is about to engage in *any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b)*, the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order. In any proceeding hereunder the United States shall be liable for costs the same as a private person." (Emphasis added.)

The House Report on the Act—there was no Senate Report—clearly states the purpose of the amendments to 1971:

> "[T]his section adds new matter. The provision is a further declaration of the right to vote for Federal offices. It states clearly that *it is unlawful for a private individual* as well as one acting under color of law to interfere or attempt to interfere with the right to vote at any general, special or primary election concerning Federal offices. This amendment, however, does not provide for a remedy. However, the succeeding subsection of the amendment, which is designated subsection (c), does provide a remedy in the form of a civil action instituted on the part of the Attorney General." House Report No. 291, to accompany H.R.6127, U.S.Code Cong. and Adm. News 1966, 1977 (1957) (Emphasis added)

Although Congress narrowed the subject matter of the statute to voting rights, there is nothing narrow about the scope of the Act as to interference with voting rights. The statute is not limited

---

17. Section 1971(a) derived from the Civil Rights Act of 1870, defined voting rights as follows:

"(a) All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding".

to physical acts or to direct interference with the act of voting but applies to—

> "any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b) * * *."

The statute applies to "any person" who shall—

> "intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce for the purpose of interfering with the right of such person to vote."

There is no doubt that this language applies to private individuals. And there is very little doubt that the Act protects the right to regiser and to engage in activities encouraging citizens to register. As discussed more fully elsewhere, registration is an integral, indispensable part of the voting process.[18] It is also a stage that is vulnerable to abuse by the registrar or to unlawful conduct by private persons. Ever since the Supreme Court outlawed the "white" primary, it has been apparent that the main battleground in the war over Negro suffrage would be the registration office.[19] See, for example, the description of the activities of the Citizens Councils and parish registrars in United States v. State of Louisiana, E.D.La.1963, 225 F.Supp. 353, 378–380. Congress was well aware that a major mischief to be combatted in the 1957 Act was economic coercion and threats of intimidation by private persons that would deny or interfere with the Negro's access to registration.[20]

More often than not, the economic coercion and intimidation by private persons are triggered by an educational campaign to encourage registration. United States v. Beaty, 6 Cir. 1961, 288 F.2d 653 is a case in point. The case arose in Haywood County, Tennessee, a county in which no Negroes were registered to vote. In the spring of 1959, a newly formed Civic and Welfare League, apparently similar to the Bogalusa Voters League, initiated a campaign in Haywood and in Fayette Counties to encourage Negroes to register. This led to the institution of a "white" primary in Fayette; later prohibited by a consent decree in April 1960. In the face of a renewed registration drive, white businessmen in both counties retaliated by circulating a "blacklist" containing the names of the Negroes who registered and white citizens who assisted them. The businessmen induced local merchants to boycott anyone whose name appeared on the list, by denying credit and the right to buy necessities through the usual business relations. White landowners evicted sharecroppers and tenant farmers who had registered or whose names appeared on the blacklist. The Attorney General sued the businessmen and landowners, under Section 1971, for immediate injunctive relief.[21] The district judge

---

18. See Section III, B, (1), (b) of opinion.

19. See Key, Southern Politics 555 (1949); Civil Rights Commission Report 133–38 (1961).

20. In a note, Beatty, Private Economic Coercion and the Civil Rights Act of 1957, 71 Yale L.Jour. 536, 543 (1962), the author points out:
 "The Circuit Court's construction of the 1957 act to apply to *economic* coercion in general and to economic coercion involving contract and property rights in particular seems correct. In requesting legislation to protect voting rights, President Eisenhower noted: 'It is disturbing that in some localities allegations persist that Negro citizens are being deprived of their right to vote and are likewise being subjected to unwarranted economic *pressures*.' Senator Douglas, a sponsor of the bill, asserted that the legislation was directed at denials of voting rights '*by economic pressure*' as well as by other *means*. And Representative Celler, a House sponsor, indicated that if 'the milk dealer, the coal dealer, the butcher, the baker and the candlestick maker * * * agree * * * to boycott' persons who try to vote, the agreement would violate the proposed law."

21. The Attorney General brought a similar suit to enjoin "intimidation, threat, and coercion" in Fayette County. United States v. Atkinson, et als, Civ.Ac. 4121, 6 R.Rel.L.Rep. 200 (1962). See Mendelson, Discrimination (Pren.Hall 1962) 21. And see United States v. Ellis, W.D.S.C. 1942, 43 F.Supp. 321, 324.

granted a restraining order enjoining the businessmen from "interfering through intimidation and/or coercion", but refused to enjoin the landowners on the ground that the Civil Rights Act did not vest the court with authority "to adjudge contracts and property rights". 6 Race Rel.L.Rep. 200. The Sixth Circuit affirmed the judgment as to the businessmen and extended the injunction to the landlords.[22]

In East Carroll Parish, Louisiana, cotton growers refused to gin cotton for Negro farmers who had attempted to register to vote. The Attorney General again sued under the 1957 Act, asking for preventive relief, against owners, operators, and managers of cotton gin businesses and certain other businesses "refusing to gin * * * refusing to sell goods or services, and to conduct ordinary business transactions with, any person for the purpose of discouraging or dissuading such person from attempting to vote and * * * engaging in any attempted threats, intimidations, or coercion of any nature, whether economic or otherwise". Judge Dawkins entered an order, agreed to by the parties, staying proceedings for one year pending full compliance by the defendants with the terms of the proposed restraining order. United States v. Deal, W.D.La.1961, 6 Race Rel.L.Rep. 474.

The parallel between the defendants' intimidation by economic coercion in *Beaty* and in *Deal,* and the defendants' boycott and other activities in this case is too patent to be spelled out. *Beaty* and *Deal* also illustrate a principle of enormous importance in the enforcement of civil rights: acts otherwise lawful may become unlawful and be enjoined under Section 1971, if the purpose and effect of the acts is to interfere with the right to vote.

In United States v. Board of Education of Greene County, Mississippi, 1964, 332 F.2d 40, the Fifth Circuit affirmed the holding below that the government failed to prove that the alleged intimidation was for the purpose of interfering with the right to vote. But, as Judge Tuttle explained in United States v. Bruce (decided Nov. 16, 1965, 353 F.2d 474), the Court in the *Greene County* case assumed:

> "Whereas a school board might, under the circumstances present in that case, have legally failed to renew a teacher's contract for any reason or for no reason at all, if it in fact declined to renew the [teacher's] certificate as a means of coercing or intimidating the teacher as to her right to vote, such conduct would be prohibited under the Act."

In United States v. Bruce twenty-eight white persons in Wilcox County, Alabama, notified Lonnie Brown, a Negro insurance collector, to stay off land owned or controlled by them. As a result Brown could not reach many of his policyholders. Brown had been active in urging his Negro neighbors and friends to register to vote in Wilcox County, a county where no Negroes were registered. The Court held that the trial court erred in dismissing the complaint:

> "The background allegations make a strong case upon which the trial court could infer the correctness of the conclusionary allegations that these defendants did in fact 'intimidate and coerce' the Negro citizens of Wilcox County, through the person of Lonnie Brown, for the purpose of interfering with their right to vote."[23]

---

22. The Sixth Circuit said:
 "If sharecropper-tenants in possession of real estate under contract are threatened, intimidated or coerced by their landlords for the purpose of interfering with their rights of franchise, certainly the fact that the coercion relates to land or contracts would furnish no excuse or defense to the landowners for violating the law." 288 F.2d 653, 656.

23. Judge Tuttle added:
 "Thus although the defendants here may have had an almost unrestricted right to invoke the Alabama trespass law to keep all persons from entering upon their property after warning, in

■ We hold that the Civil Rights Act of 1957 applies to private persons, including the defendants impleaded in this case. We hold that the Act applies to interfering with the right to register as well as interfering with the right to vote; that the Act protects Negro citizens against the coercion, intimidation, and violence the defendants admitted or were proved to have committed in this case.

(2) *The Civil Rights Act of 1964.* The '64 Act creates new categories of civil rights and extends the authority of the Attorney General to protect such rights by a civil suit for injunctive relief against any person, public or private.

■ For purposes of this proceeding, the most pertinent provisions are those relating to (a) places of public accommodation, (b) equal employment opportunities, and (c) public facilities. As clearly as words can say, these provisions reach any person and any action that interferes with the enjoyment of civil rights secured by the Act. Thus, 42 U.S.C. § 2000a–2 of Title II, is not limited to prohibiting discrimination or segregation by the owner or manager of a place of public accommodation. The section provides:

"No person shall (a) withhold, deny, ·or attempt to withhold or deny, or deprive or attempt to deprive, any person of any right or privilege secured by section 2000a or 2000a–1 of this title, or (b) *intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person with the purpose of interfering* with any right or privilege secured by section 2000a or 2000a–1 of this title, or (c) punish or attempt to punish any person for exercising or attempting to exercise any right or privilege secured by section 2000a or 2000a–1 of this title."

the exercise of a desire to exercise exclusive ownership and proprietary interest in their property, they could not legally invoke the right of excluding Lonnie Brown, who had previously been given free access to the property, *as a*

And to enforce the law, Section 2000a–5 (a) allows the Attorney General to sue "any person or group of persons":

"Whenever the Attorney General has reasonable cause to believe that *any person or group of persons* is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action * * * requesting such preventive relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described." [Emphasis supplied.]

Section 2000e–6 of Title VII, relating to equal employment opportunities, tracks the language of Section 2000a–5(a).

■ This suit is not one to desegregate public facilities under Title VII of the Act. However, Section 2000–b is relevant, since it demonstrates again the broad Congressional objective of authorizing the Attorney General to sue as defendants "such additional parties as are or become necessary to the grant of effective relief". The defendants' interference with the right of Negroes to use public facilities in Bogalusa is relevant to the cause of action, for that interference was part of a pattern and practice of total resistance to the Negroes' exercise of civil rights.

(3) In sum, in the Civil Rights Acts of 1957 and 1964, Congress recognized that when a Negro is clubbed or coerced for having attempted to register or for having entered a "white" restaurant, the ac-

*threat or means of coercion for the purpose of interfering with his right or the right of others whom he represented in exercising their right to register and vote.*"

tion most likely to produce effective relief is not necessarily for the Negro to complain to the local police or to sue for damages or to make charges under 18 U.S.C. §§ 241, 242. The most effective relief for him and for all others affected by the intimidation may be an injunction by the Nation against the private persons responsible for interfering with his civil rights.

■ Effectiveness of remedy is not the only reason for the Congressional grant of authority to the Attorney General of the United States. The Nation has a responsibility to supply a meaningful remedy for a right it creates or guarantees. As Justice Story wrote, in sustaining the constitutionality of the Fugitive Slave Act of 1793:

> "If, indeed, the constitution guarantees the right, and if it requires the delivery [of the fugitive slave] upon the claim of the owner * * *, the natural inference certainly is, that the national government is clothed with the appropriate authority and functions to enforce it. The fundamental principle, applicable to all cases of this sort, would seem to be, that when the end is required, the means are given. * * *" Prigg v. Com. of Pennsylvania, 1842, 41 U.S. (16 Pet.) 539, 614, 10 L.Ed. 1060.

It is one thing when acts are mere invasions of private rights; "it is quite a different matter when congress undertakes to protect the citizen in the exercise of rights conferred by the constitution of the United States, essential to the healthy organization of the government itself". Ex parte Yarbrough, 1884, 110 U.S. 651, 666, 4 S.Ct. 152, 159, 28 L.Ed. 274. We turn now to the defendants' constitutional arguments.

## B.

The defendants' constitutional arguments rest on a misunderstanding of the constitutional sources for the Civil Rights Acts of 1957 and 1964.[24]

■ (1) *The Civil Rights Act of 1957: Protection of Right to Vote From Unlawful Interference.* (a) In upholding the constitutionality of the voting provisions of the 1957 Act, we need not consider the Civil War Amendments.[25] Section 1971(b), here enforced under 1971(c), is limited to prohibiting interference with the right to vote in elections for federal office. Article I, Section 4 of the Constitution is an express grant of authority to Congress to regulate federal elections:

> "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

■ As the House Committee pointed out in its report on the law, United States v. Classic, 1941, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368, "establishes the authority in Congress to legislate concerning any and all elections affecting Federal officers, whether general, spe-

---

24. The Supreme Court has affirmed the constitutionality of various provisions of the 1957 Act on other grounds than those at issue here. United States v. Thomas, 1960, 362 U.S. 58, 80 S.Ct. 612, 4 L.Ed. 2d 535; United States v. Raines, 1960, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524; Hannah v. Larche, 1960, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307.

25. Although a statute that is "necessary and proper" legislation to carry out the power of Congress to regulate elections for federal office may also be "appropriate legislation" to "enforce" the pro-

visions of the 15th, 14th, and 13th amendments. The predecessor of Section 1971 (a) withstood attack on constitutional grounds. In re Engle, C.C.D.Md.1877, 8 Fed.Cas. p. 716, No. 4,488. It was held to be a valid exercise of congressional power under the 15th Amendment. Chapman v. King, 5 Cir. 1946, 154 F.2d 460, cert. denied, 327 U.S. 800, 66 S.Ct. 905, 90 L.Ed. 1025; Kellogg v. Warmouth, C.C.D.La.1872, 14 Fed.Cas. p. 257, No. 7,667.

The Voting Rights Act of 1965 rests, in part, on Section 2 of the 15th Amendment.

cial, or primary, as long as they are 'an integral part of the procedure of choice or where in fact the primary effectively controls their choice.'" U.S.Code Cong. and Adm.News, 85 Cong.1957, p. 1977. The Supreme Court said, in *Classic:*

"While, in a loose sense, the right to vote for representatives in Congress is sometimes spoken of as a right derived from the states, [citations omitted] this statement is true only in the sense that the states are authorized by the Constitution, to legislate on the subject as provided by § 2 of Art. I, to the extent that Congress has not restricted state action by the exercise of its powers to regulate elections under § 4 and its more general power under Article I, § 8, clause 18 of the Constitution 'To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers.'"

■ (b) Under the "sweeping clause", Article I, Section 8, Clause 18, Congress may enact all laws "necessary and proper" to carry out any of its powers, including, of course, its power to regulate federal elections. This provision leaves to Congress the choice of the means to execute its powers. "Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution are constitutional". M'Culloch v. Maryland, 1819, 4 Wheat. 316, 421, 4 L.Ed. 579.

"There is little regarding an election that is not included in the terms, time, place, and manner of holding it". United States v. Munford, 1833, C.C.E.D.Va., 16 F. 223. The Supreme Court has said:

"It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, *registration,* supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." Smiley v. Holm, 1932, 285 U.S. 355, 366, 52 S.Ct. 397, 399, 76 L.Ed. 795.

■ Two facts make it appropriate for Congress to reach registration as part of the "manner of holding elections". First, registering is a prerequisite to voting. Second, registration is a process for certifying a citizen as a qualified voter in both federal and state elections. A law protecting the right to vote could hardly be appropriate unless it protected the right to register.[26] In *Classic* language, registering is a "necessary step" and "integral" in voting in "elections". In *Classic* "interference with the effective choice of the voters" in a Louisiana Democratic primary was interference "at the only stage of the election procedure when their choice is of significance". Here, in terms of a meaningful right to vote, interference with Negro citizens' registering is interference at the most critical stage of the election procedure. It is true of course that the framers of the Constitution did not know about the registration process; but neither did they have in mind the selection of sena-

---

**26.** "An abundance of judicial dicta and holdings in analogous situations make clear that the federal power to regulate elections extends equally to the registration process. Any matter affecting the character or choice of the federal electorate is so integrally related to the election ultimately held as to come within the 'holding' of the election under article I, section 4." Van Alstyne, Anti-literacy Test Legislation, 61 Mich.L.Rev. 805, 815 (1963).

tors and representatives by the direct primary. In United States v. State of Louisiana, E.D.La.1963, 225 F.Supp. 353, 359, aff'd. on other grounds, 1965, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 this Court said:

"Congressional authority [under Article I, § 4] extends to registration, a phase of the electoral process unknown to the Founding Fathers but today a critical, inseparable part of the electoral process which must necessarily concern the United States, since registration to vote covers voting in federal as well as in state elections."

In United States v. Manning, W.D.La. 1963, 215 F.Supp. 272, one of the constitutional attacks on the Civil Rights Act of 1960 was directed at the provision for federal registrars. In the opinion upholding the act, the Court considered it important that—

"For purposes of accomplishing the constitutional objective the electoral process is indivisible. The act of casting a ballot in a voting booth cannot be cut away from the rest of the process. It is the last step in a process that starts with registration. Similarly, registration is an indivisible part of elections. * * * There is no separate registration for federal elections. Any interference with the qualified voter's right to register is therefore interference with a federal election." 215 F. Supp. at 283.

▇ (c) *Classic* relied on three important cases that construe the nature and extent of the power of Congress to regulate federal elections: Ex parte Siebold, 1880, 100 U.S. 371, 25 L.Ed. 717; Ex parte Yarbrough, The Ku Klux Klan cases, 1884, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274; and Burroughs v. United States, 1934, 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484, 485. These cases point to the principle that a congressional statute protecting against private interference before the voting stage is necessary and proper legislation under Article I, Section 4, whenever it is reasonably related to "protection of the integrity" of the federal electoral process. *Classic,* 313 U.S. at 316, 61 S.Ct. at 1038.

Ex parte Siebold involved a conviction of state election officers for ballot-stuffing in a federal election. The Court had before it the Enforcement Act from which Section 1971 was derived. The statute contained a number of extensive voting and registration regulations, including a provision for the appointment of federal election supervisors. These supervisors were authorized "to cause such names to be registered as they may think proper to be so marked". In sustaining the validity of the legislation under Article I, Section 4, the Court commented:

"It is the duty of the States to elect representatives to Congress. *The due and fair election of these representatives is of vital importance to the United States.* The government of the United States is no less concerned in the transaction than the State government is. *It certainly is not bound to stand by as a passive spectator, when duties are violated and outrageous frauds are committed.* It is directly interested in the faithful performance, by the officers of election, of their respective duties. Those duties are owed as well to the United States as to the State." 100 U.S. 388.

▇ ▇ In *Yarbrough* the Court had before it the question whether Congress could protect civil rights against private interference, specifically klan aggression in the form of intimidation of voters. Yarbrough and eight other members of a Georgia klan were indicted for conspiring to intimidate a Negro in the exercise of his right to vote for a congressional representative. It was shown that they used physical violence and that they went in disguise upon the public highways. They were convicted under the section of the Enforcement Act of 1870, Revised Statutes Section 5508, that was the predecessor of 18 U.S.C. § 241; and also under Section 5520. These are the criminal law

counterpart to 42 U.S.C. § 1971. The Act forbade two or more persons to "conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States" or to "go in disguise on the highway, or on the premises of another, with intent to prevent or hinder [such citizen in] his free exercise or enjoyment" of any such right; or to "conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote" from voting for presidential electors or members of Congress. Justice Miller, in a powerful opinion for the Court, sustained the conviction and held the statute valid. The opinion made it clear that the right to vote in federal elections is a privilege of national citizenship derived from the Constitution. Congress therefore "can, by law, protect the act of voting, the place where it is done, and the man who votes from personal violence or intimidation, and the election itself from corruption or fraud." Nor does it matter that state and federal offices are elected in the same election. The congressional powers are not "annulled because an election for state officers is held at the same time and place". 110 U.S. at 662, 4 S.Ct. at 157.

 The heart of the *Yarbrough* decision is the Court's emphasis on the transcendent interest of the federal government.[27] The violence and intimidation to which the Negro was subjected were important because they alloyed the purity of the federal political process. The federal government "must have the power to protect the elections on which its existence depends from violence and corruption". 110 U.S. at 658, 4 S.Ct. at 155. *This* implied power arises out of governmental necessity. The Court said:

> "The power in either case arises out of the circumstance that the function in which the party is engaged or the right which he is about to exercise is dependent on the laws of the United States.

> "In both cases it is the duty of that government to see that he may exercise this right freely, and to protect him from violence while so doing, or on account of so doing. This duty does not arise solely from the interest of the party concerned, but from the necessity of the government itself that its service shall be free from the adverse influence of force and fraud practiced on its agents, and that the votes by which its members of congress and its president are elected shall be the *free* votes of the electors, and the officers thus chosen the free and uncorrupted choice of those who have the right to take part in that choice."

Since it is the purity of the federal political process that must be protected, the protection may be extended against interference with any activity having a rational relationship with the federal political process. Thus, the "rationale of Yarbrough indicates congressional power over voting, though limited to federal elections, extends to voter registration activities", including registration rallies, voter education classes, and other

---

**27.** Our silence with respect to the 15th Amendment carries no implied comment as to the scope of that amendment. We found it unnecessary to consider the 15th Amendment because of the Nation's manifest interest in the integrity of federal elections and the Supreme Court's approval of a constitutional basis for that interest. On its face, however, Section 1 of the Fifteenth Amendment clearly establishes a constitutional basis for Congress to protect the unabridged right of all citizens to vote in state elections free from discrimination on account of race. Given that basis, a congressional statute protecting citizens from state or private interference with the right to participate in any part of the voting process (registration, primary, pre-primary, etc.) would seem to be as "appropriate" for protection of voters in state elections, under Section 2 of the 15th Amendment, as it is "necessary and proper" for protection of voters in federal elections.

activities intended to encourage registration.[28]

■ *Burroughs* is one of a number of cases dealing with corrupt election practices which go far beyond the act of voting in an election. The Federal corrupt practice laws operate on the campaigning stage rather than the voting stage and apply to private persons having no part in the election machinery. In *Burroughs* the contention was made that under Article II, Section 1 the states control the manner of appointing presidential electors; Congress is limited to prescribing the time of choosing electors and the day on which they cast their votes. In upholding the validity of the Federal Corrupt Practices Act of 1925, the Court, relying on *Yarbrough,* said:

"While presidential electors are not officers or agents of the federal government * * *, they exercise federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of the United States. The president is vested with the executive power of the nation. The importance of his election and the vital character of its relationship to and effect upon the welfare and safety of the whole people cannot be too strongly stated. To say that Congress is without power to pass appropriate legislation to safeguard such an election from the improper use of money to influence the result is to deny to the nation in a vital particular the power of self-protection. Congress undoubtedly, possesses that power, as it possesses every other power essential to preserve the departments and institutions of the general government from impairment or destruction, whether threatened by force or by corruption." 290 U.S. at 545, 54 S.Ct. at 290.

■■ The states' power over the manner of appointing presidential electors is similar to the states' reserved power to establish voting qualifications. Notwithstanding this unquestioned power in the states, *"Burroughs* holds that 'Congress' has the implied power to protect the integrity of the processes of popular election of presidential electors once that mode of selection has been chosen by the state." There is an obvious parallel between corruption of the federal electoral process by the use of money and corruption of the same process by acts of violence and intimidation that prevent voters from getting on the registration rolls or, indeed, from ever reaching the registration office.

*Classic* involved federal indictments against state election commissioners for falsely counting ballots in a Democratic party primary. The Court held that under Article I, Section 4 and the necessary and proper clause, Congress had the implied power to regulate party primaries. The "interference [was] with the effective choice of the voters at the only stage of the election procedure when their choice is of significance * * *. The primary in Louisiana is an integral part of the procedure for the popular choice of Congressmen". The right to choose is a right "secured by the Constitution". 313 U.S. at 314, 61 S.Ct. at 1037. Moreover, "since the constitutional command is without restriction or limitation, the right unlike those guaranteed by the Fourteenth and Fifteenth Amendments, *is secured against the action of individuals as well as of states."* Ib. at 315, 61 S.Ct. at 1038 Mr. Justice Stone, for the Court, spelled out the rationale:

"The right to participate in the choice of representatives for Congress * * * is protected just as is the right to vote at the election, where the primary is by law made an integral part of the election machinery * * *. Unless the constitutional protection of the integrity of 'elections' extends to pri-

28. Comment, Federal Civil Action Against Private Individuals for Crimes Involving Civil Rights, 74 Yale L.Jour. 1462, 1470 (1965). And see Maggs and Wallace, Congress and Literacy Tests, 27 Duke L. & Cont. Prob. 510, 517–521 (1962).

mary elections, Congress is left powerless to effect the constitutional purpose * * *." 313 U.S. at 318, 319, 61 S.Ct. at 1039.

The innumerable cases in this Circuit involving civil rights speak eloquently against the use of economic coercion, intimidation, and violence to inhibit Negroes from applying for registration. This interference with nationally guaranteed rights, whether by public officials or private persons corrupts the purity of the political process on which the existence and health of the National Government depend. No one has expressed this better than Judge Rives in United States v. Wood, 5 Cir. 1961, 295 F.2d 772, cert. denied 369 U.S. 850, 82 S.Ct. 933, 8 L.Ed.2d 9 (1962).[29] In *Wood* the interference was in the form of groundless prosecution of a Negro organizer who had set up a registration school in Walthall County, Mississippi, where no Negroes had ever registered. He was not even qualified to vote in the county where the intimidatory acts occurred; he was a resident of another county. In reversing the district judge's refusal to stay the state prosecution, the Fifth Circuit noted that the alleged coercion was of the kind the 1957 Act was intended to reach. Judge Rives, for the Court, said:

"The foundation of our form of government is the consent of the governed. Whenever any person interferes with the right of any other person to vote or to vote as he may choose, he acts like a political termite to destroy a part of that foundation. A single termite or many termites may pass unnoticed, but each damages the foundation, and if that process is allowed to continue the whole structure may crumble and fall even before the occupants become aware of their peril. Eradication of political termites, or at least checking their activities, is necessary to prevent irreparable damage to our Government."

*We hold that the defendants' acts of economic coercion, intimidation, and violence directed at Negro citizens in Washington Parish for the purpose of deterring their registering to vote strike at the integrity of the federal political process. The right to vote in federal elections, a privilege of national citizenship secured by the United States Constitution, includes the right to register to vote. The right to register to vote includes the right to be free from public or private interference with activities rationally related to registering and to encouraging others to register.*

(2) *The Civil Rights Act of 1964: Public Accommodation.* The Supreme Court has upheld the constitutionality of Title II as it applies to motels and restaurants. Heart of Atlanta Motel v. United States, 1964, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258; Katzenbach v. McClung, 1964, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed. 2d 290.

The defendants are left, therefore, only with the contention that the Act, for reasons not articulated, should not reach private persons.

The defendants are really arguing against the judgment of Congress in selecting injunctive relief against private persons as one method of·enforcing congressional policy. Once it is conceded that Congress has the power, under the commerce clause, to forbid discrimination

---

**29.** In that case Hardy, a Negro resident of Tennessee, a member of the "Student Non-Violent Coordinating Committee", was in Walthall County, Mississippi for the purpose of organizing Negroes of that county to register and vote. Hardy engaged in an argument with the registrar. The registrar ordered him to leave the office. As he got to the door, the registrar struck him on the back of the head with a revolver. Hardy was arrested and charged with a breach of the peace. The Court hurdled (1) the fact that Hardy was not eligible to register and therefore *his* right to vote was not interfered with; (2) the appeal was from a denial of a request for a temporary restraining order, generally an unappealable order under 28 U.S.C. §§ 1291, 1292; (3) the prosecution was a state criminal court proceeding, protected by the doctrine of comity and Section 2283 severely restricting federal injunctions of state proceedings.

in public places, there is little doubt that injunctive relief against any person seeking to frustrate the statutory objective is appropriate.

In this Circuit, relying on In re Debs, 1895, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092, the courts have held that when private persons burden commerce to the detriment of the national interest, the Nation may enjoin such persons even without enabling legislation. On two occasions courts have issued injunctions against klans and klansmen engaged in intimidation and violence burdening commerce. United States v. U. S. Klans, M.D.Ala.1961, 194 F.Supp. 897; Plummer v. Brock, M.D.Fla.1964, 9 R.Rel.L. Rep. 1399. See also United States v. City of Jackson, 5 Cir. 1963, 318 F.2d 1.

(3) *The Civil Rights Act of 1964: Equal Employment Opportunities.* Title VII, like Title II, *is based upon the commerce clause.* The term "industry affecting commerce" used in Title VII parallels the definition of "industry affecting commerce" in the *LMRDA* (29 U.S.C. § 402(c)). This in turn incorporates the definition of "affecting commerce" in the NLRA (29 U.S.C. § 152 (7)). The National Labor Relations Act represents an exercise of congressional regulatory power to "the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause," NLRB v. Reliance Fuel Oil Corp., 1963, 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279; Polish National Alliance of United States v. NLRB, 1944, 322 U.S. 643, 647, 64 S.Ct. 1196, 88 L.Ed. 1509, a conclusion equally applicable to Title VII.

The sweeping regulations in the NLRA and LMRDA covering the terms, conditions, and policies of hiring and bargaining do not differ in any essential respect from this legislation prohibiting discrimination in hiring practices and on the job assignments. The employer-employee relationship has, of course, direct effect upon the production of industries which are in commerce and upon the practical utilization of the labor force and the power of Congress to regulate these activities cannot be doubted. NLRB v. Jones & Laughlin Steel Corp., 1936, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893; NLRB v. Fainblatt, 1939, 306 U.S. 601, 606, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014; Mabee v. White Plains Publishing Co., 1946, 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607.

Defendants admit that they beat and threatened Negro pickets to prevent them from enjoying the right of equal employment opportunity. The effect of course is to prevent Negroes from gaining free access to potential employers. Such acts not only deter Negroes but intimidate employers who might otherwise wish to comply with the law but fear retaliation and economic loss. This is precisely what the klan's Boycott Rules are designed to do.

The United States has alleged, the defendants have admitted, and the proof has shown that the defendants have intimidated, harassed, and in other ways interfered with the civil rights of Negroes secured by the Constitution. The admission and proof show a pattern and practice of interference.

Protection against the acts of terror and intimidation committed by the Original Knights of the Ku Klux Klan and the individual defendants can be halted only by a broad injunctive decree along the lines of the order suggested by the United States. The Court will promptly issue an appropriate order.[30]

---

30. The Court finds that on the admissions and on the evidence adduced at the hearing, a preliminary injunction should not issue against Charles Ray Williams, Louis Applewhite, and Willis Blackwell. The Court does not enter a judgment of dismissal as to these defendants, because the United States expressly reserved the right to introduce additional evidence at the hearing for permanent relief, as to these and other defendants. At the time of the hearing, Blackwell had not been correctly served. We find that James Ellis, Sidney August Warner, and Albert Applewhite are members of the klan— ACCA or were members until recently, and therefore should be enjoined. The defendants' request for dismissal of the action as to these named defendants and their request for attorneys fees are denied.