**UNITED STATES of America,
Appellant,**

v.

**Blanchard McLEOD et al., Appellees.**

**UNITED STATES of America,
Appellant,**

v.

**DALLAS COUNTY et al., Appellees.**

**Nos. 21475, 21477.**

United States Court of Appeals
Fifth Circuit.

Oct. 16, 1967.

WISDOM, Circuit Judge:

These cases are the product of the racial unrest in 1963 in Dallas County, Alabama, of which Selma is the county seat. "Yet Selma was different from the usual clash between police in the South and protesting groups of Negroes and civil rights workers. For out of Selma grew the Voting Rights of 1965." [1]

The Dallas County Voters League was organized to encourage local Negroes to register and vote. Early in 1963, at the request of the Voters League, the Student Nonviolent Coordinating Committee sent volunteers to Selma to aid in the registration drive. One of the main projects of the Voters League was the sponsorship of voting clinics. To publicize these clinics, the Voters League began in May 1963 to sponsor mass meetings at local Negro churches. The League distributed literature urging Dallas County Negroes to register to vote and kept records of the successful and unsuccessful applicants.

By special arrangement Sheriff James G. Clark was in charge of the Selma police with regard to racial matters. Sheriff Clark stationed officers—deputy sheriffs, members of the sheriff's posse, and local police—in and around the various mass meetings. These officers made notes during the meetings, took down the license numbers of cars in the area, and spoke with each other and with the sheriff's office by portable two-way radio.

June 17, 1963, Bosie Reese, a young local volunteer worker, went to the Dallas County Courthouse to interview some of the people waiting in the registration line. He testified that his purpose was to obtain names and addresses for the records kept by the Voters League.[2] Sheriff Clark testified that Reese was "molesting" the registration line and that he told the young Negro to leave the Courthouse. The evidence is in conflict whether Reese did in fact leave the

---

Harold H. Greene, John Doar, David L. Norman, Attys., Dept. of Justice, Washington, D. C., Vernol R. Jansen, Jr., U. S. Atty., Mobile, Ala., for appellant.

T. G. Gayle, J. E. Wilkinson, Jr., Selma, Ala., Wm. McLean Pitts, Selma, Ala., Richmond M. Flowers, Atty. Gen., Gordon Madison, Asst. Atty. Gen., Montgomery, Ala., for appellees.

Before WOODBURY,* WISDOM and BELL, Circuit Judges.

---

* Of the First Circuit, sitting by designation.

1. Comment, Federal Protection of Voting Rights, 51 Va.L.Rev. 1051, 1052 (1965).

2. Bernard Lafayette, who was in charge of the registration drive, testified that he sent Reese to the Courthouse for that purpose.

Courthouse; but some time later, in the Courthouse, Sheriff Clark arrested him for disobeying his order to leave. County officials changed the charge to disturbing the peace and resisting arrest. Reese was tried and convicted of the two offenses. The trial judge, a defendant in this case,[3] sentenced him to pay a fine of two hundred dollars plus costs.

The day after Reese was arrested, Sheriff Clark swore out a warrant for the arrest of Bernard Lafayette, a field secretary for SNCC who was in charge of the Dallas County voting drive. The charge: vagrancy. Sheriff Clark testified that he was not aware that Lafayette had any visible means of support and that he had confidential reports that Lafayette, an able-bodied man, had been seen begging.[4] The Sheriff candidly admitted that he had engaged in no further investigation with respect to these charges. When the police booked Lafayette at the county jail, he had nearly thirty dollars in cash in his pockets. Nevertheless, Dallas County officials prosecuted Lafayette for vagrancy. He was acquitted upon his testimony that the SNCC paid his living expenses.

June 26, 1963, the United States filed a complaint in United States v. Dallas County. It alleged that the surveillance of the meetings, along with the arrest and prosecution of Reese and Lafayette tended to threaten and coerce the Negro citizens of Dallas County in the exercise of their right to vote, and that the county officials intended their acts to have just that effect. The complaint prayed that the same and similar acts be enjoined as in violation of the Civil Rights Act of 1957, 42 U.S.C. § 1971(b).[5]

Before the case came on for hearing, Sheriff Clark, patrolling in the vicinity of a mass meeting, stopped one of the workers, Alexander Brown, for driving a car with only one headlight operating. Clark asked Brown his name, and Brown replied, "Brown". Then Clark asked for Brown's driver's license. The name in which the license was issued was Alexander Love. Sheriff Clark promptly arrested Brown for concealing his identity.[6]

Brown attempted to explain the discrepancy to Sheriff Clark at the time of his arrest; but the Sheriff would not listen. He was not interested in explanations, he testified. Brown found that the other county officials with whom he was forced to deal had no more interest than the Sheriff. Eventually Brown was tried and acquitted of the offense of concealing his identity.[7]

United States v. Dallas County came on for a hearing in the United States District Court for the Southern District of Alabama July 25, 1963. At the conclusion of that day's hearings, the trial judge continued the case. The hearing was resumed and completed October 15, 1963.

Meanwhile, July 29, 1963, officials of the Sheriff's office arrested twenty-nine Negroes who were attending a registration meeting. In each case the charge was operating a motor vehicle with improper license-plate lights. In September and early October the streets of Selma saw several large scale demonstra-

3. In Pierson v. Ray, 1967, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288, the Supreme Court held that judges are immune from liability for *damages* in suits under 42 U.S.C. § 1983. The case does not, of course, mean that they may not be enjoined from pursuing a course of unlawful conduct.

4. 14 Ala.Code § 437 (1958).

5. "No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, * * *" 42 U.S.C. § 1971(b).

6. "Any person who changes or alters his or her name with the intent to defraud or with the intent to avoid payment of any debt, or to conceal his or her identity, shall be guilty of a misdemeanor, and, on conviction, shall be punished by a fine of not more than five hundred dollars." 14 Ala.Code § 229 (1958).

7. The court held that there was insufficient evidence of purpose to convict.

tions relating to voter registration and equal access to public accommodations. Local officials arrested large numbers of Negro demonstrators, both juveniles and adults. The United States, contending that the September and October arrests and prosecutions were relevant to the likelihood that the defendants would continue their coercive activity, sought to introduce evidence of these intervening arrests at the October 15 hearing. The trial judge excluded this evidence on the ground that events occurring after the first hearing in the case were not admissible.

The evening of the final hearing in *Dallas County*, October 15, 1963, Dr. Martin Luther King delivered an address in Selma. Shortly thereafter various Alabama officials charged that a Justice Department lawyer had transported Dr. King from Birmingham to Selma in a rented car paid for by the federal government. After an initial denial, the Justice Department admitted the substance of the charges. November 4, 1963, the Dallas County Grand Jury subpoenaed a number of lawyers from the Civil Right Division of the Justice Department to appear before it November 13. It subpoenaed a number of Negroes active in the voter drive as well. November 12, the United States filed its complaint in United States v. McLeod, seeking to enjoin the Grand Jury and other county officials from compelling the government lawyers to appear. The complaint alleges that the mass arrests of September and October, together with the action of the Grand Jury in subpoenaeing Justice Department lawyers and Negroes active in the voter registration drive, intimated Negroes with respect to their right to vote in violation of 42 U.S.C. § 1971(b). The United States asked for an injunction to prevent county officials from continuing their coercive actions.

The district court denied relief in both cases. In *Dallas County* it found that each of the allegedly coercive acts was justified—that the surveillance of the mass meetings was necessary to keep order and to protect the Negroes; that Sheriff Clark had probable cause to believe Bernard Lafayette was a vagrant; that Bosie Reese "was in fact molesting the voter registration line in that he was requesting information of persons therein * * *";[8] and that Alexander Brown was in fact using an alias. The district judge concluded "that no federal *constitutional* rights of those for whom the plaintiff sues have been violated in any way * * *". United States v. Dallas County, S.D.Ala.1964, 229 F.Supp. 1014, 1018. (Emphasis added.) "This court is of the opinion," he added, "that the plaintiff has failed in its proof * * *". Ibid.

In *McLeod* the district court disposed of the section 1971(b) count with no discussion other than to say, "Since the Dallas County case does deal with and dispose of that aspect, the Court will here confine itself * * * to the Dallas County Grand Jury phase of the case."[9] With regard to that phase of the case the district judge held that the court could not interfere with a grand jury operating in good faith; that the Dallas County Grand Jury was in fact investigating in good faith; and that it could therefore compel the Civil Rights Division lawyers to appear before it.

Since the natural division lies along the line of issues rather than along the line of cases, we discuss together the arrests and prosecutions alleged and proved in both cases, and then the grand jury aspect peculiar to the *McLeod* case.

### I.

The Civil Rights Act of 1957 makes it unlawful for any person "to intimidate, threaten, or coerce any other

8. United States v. Dallas County, S.D.Ala., 1964, 229 F.Supp. 1014, 1017.

9. United States v. McLeod, S.D.Ala.1964, 229 F.Supp. 383, 385–86. The district judge disposed of that issue in the Mc

*Leod* case on the same grounds as in *Dallas County*—that the arrests and prosecutions were justified; that the defendants violated no one's constitutional rights; and that the Government failed in its proof.

person for the purpose of interfering with the right of such other person to vote or to vote as he may choose". 42 U.S.C. § 1971(b). The trial judge did not decide the case on this statutory standard. Rather, he ruled that no federal *constitutional* rights had been violated. It is clear, however, that acts may violate section 1971(b) even though they deprive no one of his constitutional rights. Acts otherwise entirely within the law may violate the statute if they have the proscribed effect and purpose. United States by Katzenbach v. Original Knights of the Ku Klux Klan, E.D.La. 1965, 250 F.Supp. 330; United States v. Bruce, 5 Cir. 1965, 353 F.2d 474; United States v. Beaty, 6 Cir. 1961, 288 F.2d 653; United States v. Deal, W.D.La.1961, 6 Race Rel.L.Rep. 474. See Note, Private Economic Coercion and the Civil Rights Act of 1957, 71 Yale L.J. 537 (1962). The inquiry, therefore, is not whether the defendants have transgressed the Constitution. It is whether they have violated the statute.

As Judge Rives has pointed out, section 1971(b) "essentially requires proof of two ultimate facts: (1) that there was an intimidation, threat, or coercion, or an attempt to intimidate, threaten or coerce, and (2) that the intimidation was for the purpose of interfering with the right to vote." United States v. Board of Educ. of Greene County, Mississippi, 5 Cir. 1964, 332 F.2d 40, 46 (concurring opinion). The right to vote encompasses the right to register. Registration is "a critical, inseparable part of the electoral process which must necessarily concern the United States since registration to vote covers voting in federal as well as in state elections. United States v. State of Louisiana, E.D. La.1963, 225 F.Supp. 353, aff'd 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965).

Our first task, then, is to determine whether the record required the district court to find that the arrests, prosecutions and other acts complained of had a coercive effect and were for the purpose of interfering with the right to register and to vote.

These acts cannot be viewed in isolation. They must be considered against the background of contemporaneous events in Selma and the general climate prevailing there at the time. According to the United States Commission on Civil Rights, only 163 of Dallas County's 18,000 voting age Negroes (0.9 per cent) were registered in 1959. This compared with 8,800 of 12,000 whites. U. S. Comm. on Civil Rights, Report 92 (1959). In 1960 the percentage remained unchanged. U. S. Comm. on Civil Rights, Report 27 (1961). By 1964 only 2.2 per cent of the eligible Negroes had been registered. United States v. Clark, S.D.Ala.1965, 249 F.Supp. 720, 723. In 1963 this Court found that the Board of Registrars of Dallas County had engaged and was engaging in discriminatory practices. It ordered the entry of a broad injunction prescribing procedures to be followed by the board. United States v. Atkins, 5 Cir. 1963, 323 F.2d 733. A year after the acts complained of here, a three-judge court found that the officials of Dallas County made arrests, initiated prosecutions, and engaged in other intimidating and coercive activity designed to interfere with the right of Negroes to vote. United States v. Clark, S.D.Ala. 1965, 249 F.Supp. 720. The United States filed its first voting rights suit in Dallas County in April 1961. "Four years, two suits, and a great deal of intimidation later, Negro registration in Dallas County had risen all the way to 385".[10]

It is difficult to imagine anything short of physical violence [11] which would

---

10. Comment, Federal Protection of Negro Voting Rights, 51 Va.L.Rev. 1051, 1054. See Hearings on H.R. 6400 before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., at 11 (remarks of Hon. Nicholas de B. Katzenbach).

11. See United States v. Wood, 5 Cir. 1961, 295 F.2d 772, cert. denied, 369 U.S. 850, 82 S.Ct. 933, 8 L.Ed.2d 9; United States v. Edwards, 5 Cir. 1964, 333 F.2d 575, 579–581 (Brown, J., dissenting).

have a more chilling effect on a voter registration drive than the pattern of baseless arrests and prosecutions revealed in this record. NAACP v. Thompson, 5 Cir. 1966, 357 F.2d 831, cert. denied, Johnson v. NAACP, 385 U.S. 820, 87 S.Ct. 45, 17 L.Ed.2d 58. This case does not involve a "single incident". See United States v. Edwards, 5 Cir. 1964, 333 F.2d 575. But see id. at 579–581 (Brown, J. dissenting); United States v. Wood, 5 Cir. 1961, 295 F.2d 772, cert. denied, 369 U.S. 850, 82 S.Ct. 933. Nor is it a case in which extraordinary circumstances produced an overriding state interest in legitimately arresting voting workers. See United States v. Leflore County, 5 Cir. 1967, 371 F.2d 368.

The attendance statistics of the Dallas County Voters League Clinics demonstrate the effectiveness of the intimidation. From February through May 1963, the classes drew an average of 40 persons each month. Several individual classes attracted more than ten prospective voters. After the arrests began, on only one occasion did more than two people attend a class. A class on July 2 attracted five persons. Thereafter, the League suspended the clinics.

The defendants introduced affidavits of several Negroes stating that they had not been intimidated when they attempted to register to vote. When the government examined these persons in court, however, it became clear that the affidavits referred only to the period of time these persons waited in line and actually spent in the Registrar's office. The affidavits did not exclude the possibility of intimidation at other times or places. In any event, the failure of the arrests and other coercive acts to intimidate a few persons does not negative their general coercive effect.[12]

█ We hold that the trial judge clearly erred in failing to find that the defendants' acts threatened, intimidated, and coerced the prospective Negro voters in Dallas County.

## II.

█ The United States is not entitled to relief unless the defendants' acts were for the purpose of interfering with the Negroes' right to vote. United States v. Board of Education of Greene County, Mississippi, 5 Cir. 1964, 332 F.2d 40. In cases such as the one before us, the defendants' coercive purpose cannot be proved by direct evidence. We must look to circumstantial evidence and develop a standard to measure the adequacy of the government's proof. There is little or no controversy over the actual facts—what happened. The dispute between the parties is over the inference to be drawn from those facts.

We note that all of the defendants' acts took place within the context of a pattern of racial discrimination and of an intensive voter registration drive.

A. The arrests and prosecutions in June and July fall into one category. In each case, the person arrested was prominently active in the registration drive. In each, there was no basis for the arrest.

(1) In the case of Bernard Lafayette, Sheriff Clark testified that he knew Lafayette by reputation, and that he knew Lafayette was a representative from an organization in Atlanta, which was "trying to organize the niggers". Lafayette was, in fact, directing the Dallas County registration drive. The Sheriff testified that he swore out the affidavit for Lafayette's arrest on the basis of reports that Lafayette was not gainfully employed, and had been begging for money. By his own admission the Sheriff did not investigate any of these reports to determine their truthfulness. When the police booked Lafayette, they found nearly thirty dollars in cash in his pockets. Between the arrest and the trial no county official sought to determine whether

12. Successful intimidation does not require convictions. Harassment is often carried out through mesne process. See NAACP v. Thompson, 5 Cir. 1966, 357 F.2d 831, 838; Amsterdam, Criminal Prosecutions Affecting Federally Guaranteed Civil Rights: Federal Removal and Habeas Corpus Jurisdiction to Abort State Trial, 113 U.Pa.L.Rev. 793, 909–10 (1965).

in fact the charges against Lafayette were true. The inference is overwhelming that harassment was the only reason for Lafayette's arrest and prosecution.

(2) Alexander Brown's arrest for concealing his identity was also baseless. The reason for the discrepancy between the name on the driver's license and the name Brown gave the Sheriff is undisputed. "Brown" was born "Love" but since infancy had lived with his grandmother whose name was Brown. He had taken his grandmother's name, but had been required to use the name on his birth certificate to obtain a driver's license. As in Lafayette's case, however, county officials refused to listen to any explanation or to investigate the truth of Brown's story.

(3) Sheriff Clark arrested Bosie Reese because he was interviewing persons in the registration line. Reese caused no disturbance. No one in the line complained. But according to Sheriff Clark, Reese violated an unwritten rule against "molesting" lines in the Courthouse.

These arrests show that "the defendants took advantage of every opportunity, serious or trivial," to arrest prominent Negro voting registration workers. NAACP v. Thompson, 5 Cir. 1966, 357 F.2d 831, 838, cert. denied, Johnson v. NAACP, 385 U.S. 820, 87 S.Ct. 45, 17 L.Ed.2d 58. The only reasonable conclusion to be drawn from these facts is that the purpose of the Lafayette, Brown, and Reese arrests was to hamper the registration drive.

B. The arrests which took place after the initial hearing in Dallas County fall into three groups: the arrests of adults for disturbing the peace, inciting to riot, and like offenses; the arrests of numerous juveniles for truancy; and the arrests of persons leaving a mass meeting on the charge of improper license-plate lighting. All were mass arrests. All were directed against a group of persons engaging at the time in voter activity. Those in the first two categories took place in the course of peaceful demonstrations in support of Negro registration.

(1) We deal first with the arrest of the adults for demonstrating. The defendants' own testimony speaks eloquently. Blanchard McLeod, Circuit Solicitor for the Fourth Judicial Circuit testified that although the Negroes did nothing but walk back and forth carrying signs, the violent reaction of the white onlookers led county officials to the conclusion that the Negroes were inciting a riot. His testimony is quoted in the margin.[13] At least since Termi-

13. McLeod's testimony was as follows: Q Between the twenty-fifth of September and the seventh of October, 1963, a number of arrests was made around the courthouse in Selma, of pickets who were carrying voter registration signs? A That is correct. Q Did you consult with Sheriff Clark, with respect to those arrests? A I was in consultation with Sheriff Clark constantly during that period. Q You knew that those signs dealt with registering to vote, did you not? A After the first two or three days of those demonstrations, most of them did. In fact, I would say, practically all of them had voter registration signs, but, at the start, they did not. After the first two or three days, they were mainly one hundred percent on voter registration. Q You knew that those people were arrested merely for carrying voter registration signs? A No, that is not true. Q That is not true? A They were not arrested for carrying voter registration cards. Q What were they arrested for? A For inciting riots. Q Is that what they were charged with? A They were charged with unlawful assembly. Q Is what they did—carrying voter registration signs—unlawful assembly? A No, it was the fact that they were inciting the public, and the public was coming in and the riots and demonstrations were going to start, and we proceeded to stop it. Q Did you arrest any white people on any of those days around the courthouse? A I don't remember seeing any white people doing anything to incite a riot. Q You felt that the pickets' actions, in carrying those registration signs, was conduct that would incite a riot? A It was doing it. It was not a question of what I felt. It was what I actually saw. Q All that those pickets were doing was walking back and forth, carrying voter registration signs? A They were doing things that showed they apparently were getting ready to cause a riot. Q What

nello v. Chicago, 1949, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131, it has been clear that hostile reaction to peaceful speech does not justify arrest of the speaker. This is true also with respect to demonstrations. Cox v. State of Louisiana, 1965, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471.[14] See Edwards v. South Carolina, 1963, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697; Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 S.Ct.Rev. 1. There exists no constitutionally valid justification for these arrests. There is no alternative to the conclusion that their purpose was to obstruct the voter drive and to deter others from taking part in it. As Judge Brown said, dissenting in United States v. Edwards, 5 Cir. 1964, 333 F.2d 575, 581, "Nothing could be more discouraging than the fear that what happened to [the demonstrators] was the fate for others seeking this precious right."

(2) There was conflicting evidence on the question whether the demonstrations took place during school hours. Since this evidence was part of the *McLeod* record, the trial judge made no finding on the issue. Of course if the demonstrations took place after school hours, there would be no basis in fact for the numerous truancy arrests. But even assuming that the children were violating the truancy law, the context makes clear that truancy was not the reason for the arrests and prosecutions. The arresting officers made no distinction between the adult and the juvenile demonstrators. They simply herded everyone onto busses and took them to jail. Only when it came time for prosecution did the county

---

indication did you have that apparently it was going to cause a riot? A I saw the people coming in on them. Q Was any attempt made to keep the people away from them? A We did make attempts. Q Was any arrest made of any people? A It was not necessary to make any arrest, because they obeyed our orders. Q What were your orders? A To get back and mind the officers. Q Then, you went ahead and arrested the pickets? A That is right, we did. Q Subsequently, on the basis of the offense reports that were filed with those arrests, you prosecuted those people under the unlawful assembly statute? A Yes, it is Section 407, I believe. I am not positive, but it is four something. Q As I understand it, you understood the law to be that a police officer could arrest a person who was peacefully picketing, purely because his conduct was apparently likely to incite a riot, likely to incite law breakers? A First, I don't think they were doing any peaceful picketing. Their conduct, I deemed it, and all the rest of the law enforcement officers deemed they were doing things that were going to incite a riot, and we felt it was our duty to stop it, and at the same time protect them from getting hurt. Their conduct was provocative of inciting riots. Mr. Doar: All they were doing was walking up and down, carrying voter registration signs? A No, they were inciting the public. * * * Mr. Doar: * * * When you say they were inciting a riot, what were they doing? A They were marching around with those signs. Now,

these people not even eligible to register to vote were doing those things. These were people not even eligible under the laws of the State of Alabama to register to vote that were doing those things. Q (Mr. Doar continuing) Do I understand that one of the reasons why they were arrested was to protect them? A Yes, if we had not arrested them, I feared for their safety. Q But you then afterwards went ahead and prosecuted them? A I prosecuted them. Q You prosecuted them for inciting a riot? A No, for unlawful assembly. Q For unlawful assembly, in that their conduct was calculated to provoke the peace? A And was calculated to outrage the sense of decency and morals. That is right.

14. "[T]he State contends that the conviction should be sustained because of fear expressed by some of the state witnesses that 'violence was about to erupt' because of the demonstration. It is virtually undisputed, however, that the students themselves were not violent and threatened no violence. The fear of violence seems to have been based upon the reaction of the group of white citizens looking on from across the street. * * * Conceding this was so, the 'compelling answer * * * is that constitutional rights may not be denied simply because of hostility to their assertion or exercise.' Watson v. City of Memphis, 373 U.S. 526, 535, 536, 83 S.Ct. 1314, 10 L.Ed.2d 529." 379 U.S. at 550, 551, 85 S.Ct. at 462.

officials separate the men from the boys, charging some with unlawul assembly and others with truancy. The inescapable inference is that these children were not arrested for playing hooky. They were arrested for demonstrating in support of the right to vote. We are not, therefore, faced with the question of the state's interest in the legitimate enforcement of its criminal law raised in United States v. Leflore County, 5 Cir. 1967, 371 F.2d 368. These arrests violate section 1971(b) for the same reason that adult arrests violate the Act.

(3) The arrests for improper license-plate lights do raise the *Leflore* question. In *Leflore,* the Court said:

> Clearly, the state and its subdivisions may reasonably enforce their criminal laws. Often such valid enforcement may incidentally have an inhibiting or intimidating effect upon the exercise of a protected right. Yet, the unfortunate incidental effect may not be grounds for setting aside or enjoining the otherwise justifiable enforcement of the valid criminal law. 371 F.2d at 371.

This broad language could be taken to mean that no arrest of a guilty person could violate section 1971(b). The case, however, does not stand for that proposition. The Act does not exempt from its prohibition acts directed against persons guilty of crime. It does exempt acts done for purposes other than interfering with the right to vote. It is here that the probable guilt or innocence of the person arrested becomes relevant. If the person is clearly guilty, the probability that the police have acted for a legitimate reason is much greater than it is if the arrest is clearly baseless. But the fact that the person is guilty does not end the inquiry. Police may arrest guilty people for reasons other than their guilt—for example for the reason that they are Negroes who want to register and vote.

In the *Leflore* sort of case, then, the focus of inquiry is on the real purpose of the arrests, and the inference to be drawn depends on all of the surrounding facts. Factually we think *Leflore* is distinguishable from this case. In *Leflore* Negroes staged a mass demonstration near midnight in a residential section. The participants caused at least some disorder. The state's interest in enforcing the law was urgent—to preserve order in the community at night. The strength of this state interest alone points to the conclusion that the police acted for legitimate reasons. But in *Leflore* there were other indicia of justifiable enforcement. There was no history of official interference with the registration drive. There had been many previous meetings without disturbance. Local authorities affirmatively cooperated with these meetings by maintaining parking areas near the church. There was no evidence that any of the defendants had interfered with the actual registration process.

Here, on the other hand, every indication is that the police made arrests not to redress violations of the law, but simply to harass voting workers. It is common knowledge that the police often overlook violations of relatively trivial traffic laws. Rarely if ever do police mount massive law enforcement drives to eradicate the sinful practice of driving with burned out license-plate lights. When they do so on the evening of a voter registration meeting and, fortuitously of course, catch twenty-nine Negroes on their way home from that meeting and no one else, the inference of justifiable enforcement so compelling in *Leflore* loses much of its force. What little force is left is dissipated by the history of official obstruction of the voting registration process so clearly established in this record. The only purpose was to harass voting workers—a purpose proscribed by the Act.

From the foregoing discussion, we extract several criteria for measuring the sufficiency of the evidence of purpose in a section 1971(b) case. We note that Selma's history of systematic racial discrimination is an ingredient in each of the criteria. In this context we conclude first that a baseless arrest and prosecution of a person prominently active in a

voting drive compels the inference of an unlawful purpose to interfere with the right to vote. Second, constitutionally invalid interference with peaceful voting demonstrations requires that the inference be drawn. Third, indiscriminate mass arrests of persons violating a valid law, together with baseless or unconstitutional arrests of others engaged in the same voting-related activity shows the purpose to interfere. Finally, mass arrests of those who commit minor violations of state law in the course of voter activity must be considered as strong evidence that the purpose of the arrests was to interfere with the right to vote.

We hold that on this record the judge below was clearly in error in failing to draw the required inferences.

### III.

We turn now to the question of relief. When the United States originally filed these actions, it sought injunctive relief to prevent the prosecution of the persons arrested. Since we have determined that these prosecutions violated section 1971(b), the United States was entitled to an injunction under the authority of United States v. Wood, 5 Cir. 1961, 295 F.2d 772, cert. denied, 369 U.S. 850, 82 S.Ct. 933. The district court, however, denied the government's motion for an injunction, and this Court denied its motion for an injunction pending appeal. Unrestrained, the Dallas County officials proceeded with the prosecutions. On appeal, the government asks this Court not only to enjoin similar arrests, prosecutions, and other coercive acts in the future, but to order the entry

of a decree directing the defendants to expunge all convictions, return all fines, and reimburse the unlawfully arrested persons for the costs of maintaining their defenses in the state criminal proceedings.

A. A federal court is always reluctant to interfere with state criminal proceedings, because of statutory restraints [15] and because of respect for the doctrine of comity.[16] "But the sharp edge of the Supremacy Clause cuts across all such generalizations. When a State, under the pretext of preserving law and order uses local laws, valid on their face, to harass and punish citizens for the exercise of their * * * federally protected statutory rights, the general principle must yield to the exception: the federal system is imperiled." Cox v. State of Louisiana, 5 Cir. 1965, 348 F.2d 750, 752.

In this case neither Congress nor comity requires the court to stay its hand. Section 2283 of the Judicial Code provides:

A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.[17]

In the civil rights area, this Court has found such authorization in section 203 (c) of the Civil Rights Act of 1964. Dilworth v. Riner, 5 Cir. 1965, 343 F.2d 226, 227.[18] We need not reach the question whether sections 1971(b) and (c) constitute express authorization [19] for

---

15. See, e. g., 28 U.S.C. § 2283, forbidding injunctions against proceedings in a State Court; 28 U.S.C. § 2254, forbidding the issuance of habeas corpus unless the petitioner has exhausted his state remedies.

16. See, e. g., Douglas v. City of Jeannette, 1943, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324; Wilson v. Schnettler, 1961, 365 U.S. 381, 81 S.Ct. 632, 5 L.Ed.2d 620, 632; Stefannelli v. Minard, 1951, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138; Marshall, Federalism and Civil Rights (1964); Hart and Wechsler, The Federal Courts and the Federal System 862–64 (1953).

17. For a general discussion of section 2283 see Developments in the Law—Injunctions, 79 Harv.L.Rev. 994, 1045–53 (1965); Note, 74 Harv.L.Rev. 726 (1961).

18. For a generally favorable comment see 114 U.Pa.L.Rev. 561 (1966).

19. A current controversy is whether 42 U.S.C. § 1983 constitutes an express authorization under section 2283. See Dombrowski v. Pfister, 1965, 380 U.S. 479, 85

two reasons. First, this Court has held, in United States v. Wood, 5 Cir. 1961, 295 F.2d 772, cert. denied, 369 U.S. 850, 82 S.Ct. 933, that section 2283 does not apply to actions brought by the United States. See also Leiter Minerals, Inc. v. United States, 1957, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267. Second, by its own terms section 2283 is not applicable to this case because no state proceedings are now pending or in progress. Compare Dombrowski v. Pfister, 1965, 380 U.S. 479, 484 n. 2, 85 S.Ct. 1116, 14 L.Ed. 2d 22; Ware v. Nichols, N.D.Miss.1967, 266 F.Supp. 564 (concurring opinion).

The doctrine of comity, as developed in the line of cases stemming from Douglas v. City of Jeannette, 1943, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324, has as its basis two primary considerations: First, a trust that state courts will adequately protect an individual's constitutional rights with direct review by the Supreme Court correcting any errors in constitutional interpretation into which the state courts might fall;[20] and second, a desire to promote the orderly administration of justice by refraining from unnecessary interference with state proceedings.[21]

Neither consideration is present in this case. Unlike the situation in Douglas v. City of Jeannette, local law is here invoked solely for the purpose of harassment. Both the Supreme Court[22] and this Court[23] have recognized that when this occurs, deference to comity must yield to the need to protect locally unpopular federal rights against invasion by state and local governments.

▮▮▮ The defendants' reliance on comity indicates a misapprehension of the nature of this suit. When the Government initiates proceedings under section 1971, it is acting not simply to protect the rights of the particular individuals who have been harassed but also to prevent the intimidation of Negroes as a group and of citizens generally who may be frightened away from the registration office and the polls because others have been unjustly harassed. See United States v. Manning, E.D.La.1962, 215 F. Supp. 272, 295 (3-judge).[24] Thus in United States v. Wood, 295 F.2d 781, Judge Rives pointed out:

> [T]he Government here asserts the rights of all those Negro citizens in [the county] who are qualified to register and vote. The rights of these citizens are not at issue in [the state defendant's] prosecution, and remedies available to [him] in his trial are in no way available to them. Thus, if the prosecution of [the state defendant] does injure them, they have no adequate relief in his trial.

The rights of non-litigants cannot be guaranteed through the state appellate

---

S.Ct. 1116, 14 L.Ed.2d 479, n. 2; Cameron v. Johnson, 1965, 381 U.S. 741, 85 S.Ct. 1751, 14 L.Ed.2d 715 (per curiam). Compare Cooper v. Hutchinson, 3 Cir. 1950, 184 F.2d 119, and Tribune Review Pub.'Co. v. Thomas, W.D.Pa.1957, 153 F. Supp. 486, aff'd, 3 Cir. 1958, 254 F.2d 883, with Barnes v. City of Danville, 4 Cir. 1964, 337 F.2d 579 (en banc), cert. denied, 381 U.S. 939. See also Ware v. Nichols, N.D.Miss.1967, 266 F.Supp. 564 (3-judge) (concurring opinion).

On remand, the district court in Cameron v. Johnson held that section 2283 does bar a section 1983 injunction, S.D.Miss. 1967, 262 F.Supp. 873 (3-judge).

**20.** See Douglas v. City of Jeannette, 1943, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324; Harrison v. NAACP, 1959, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152; Marshall, Federalism and Civil Rights 55 (1964).

**21.** See Cleary v. Bolger, 1963, 371 U.S. 392, 83 S.Ct. 385, 9 L.Ed.2d 390; Wilson v. Schnettler, 1961, 365 U.S. 381, 81 S.Ct. 632, 5 L.Ed.2d 620; Stefannelli v. Minard, 1951, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138.

**22.** Dombrowski v. Pfister, 1965, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22.

**23.** Cox v. State of Louisiana, 5 Cir. 1965, 348 F.2d 750; United States v. Wood, 5 Cir. 1961, 295 F.2d 772.

**24.** "It is a suit not just to vindicate the constitutional rights of particular individuals as to whom evidence is presented but to vindicate the public interest in the constitutional right of all citizens to be free from racial discrimination in exercising voting rights." United States v. Manning, 215 F.Supp. 272, at 295.

process or direct Supreme Court review.[25]

The second basic principle of comity—efficient administration of justice—also has no place in this case. The State has had its say, and federal intervention at this point will not result in piecemeal litigation. Compare Cleary v. Bolger, 1963, 371 U.S. 392, 83 S.Ct. 385, 9 L.Ed. 2d 390; Wilson v. Schnettler, 1961, 365 U.S. 381, 81 S.Ct. 632, 5 L.Ed.2d 620; Stefannelli v. Minard, 1951, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138.

Federal intervention in state proceedings after judgment dates from the earliest days of the Republic. Direct Supreme Court review is perhaps the most obvious example. Martin v. Hunter's Lessee, 1816, 1 Wheat. 304, 4 L.Ed. 97; Cohens v. Commonwealth of Virginia, 1821, 6 Wheat. 264, 5 L.Ed. 257.[26] But inferior federal courts have traditionally intervened also, to grant habeas corpus [27] and to enjoin the enforcement of void state civil judgments.[28]

 The defendants urge that the Supreme Court's decision in City of Greenwood v. Peacock, 1966, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944, limiting the removal of civil rights cases, indicates a policy of general applicability to restrict federal interference with state criminal proceedings. To the contrary, the Court in *Peacock* made clear that it was not deciding a question of federalism, but had limited its consideration to the construction of the statute there involved. Explicitly and emphatically it reaffirmed the power of the federal courts to redress flagrant denials of federally guaranteed rights, whether by means of injunction, habeas corpus,[29] direct Supreme Court review, criminal prosecution under 18 U.S.C. § 241,[30] or civil liability under 42 U.S.C. § 1983.[31] 384 U.S. at 828–830, 86 S.Ct. 1800.

B. The Government seeks an unusual remedy in this case. Usually when a court directs the return of fines and the reversal or expungement of convictions, it is acting on direct review or sitting in habeas corpus rather than entering a statutory injunction. Yet we cannot permit the similarity of the remedy sought here to remedies traditionally reserved to other form of proceedings to deter us from fashioning effective relief under section 1971(c). Cf. N. L. R. B. v. George E. Light Boat Co., 5 Cir. 1967, 373 F.2d 762, 767–768.

 Harassment in the form of baseless arrests and prosecutions is one of the most effective means of putting a halt to a voter registration drive. See

25. One of the bases for the decision in Douglas v. City of Jeannette was the absence of a showing of irreparable injury. Because the interest of the United States and the rights of all Dallas County Negroes cannot be represented in state trials and appeals, irreparable injury is present here. See United States v. Wood, 295 F.2d at 784.

26. Today direct review is more palatable than intervention by the inferior federal courts. See Note, Theories of Federalism and Civil Rights, 75 Yale L.J. 1007, 1009–10 (1966). In the days of Martin v. Hunter's Lessee, however, direct review was a live issue. See Hart and Wechsler, The Federal Courts and the Federal System 418–21 (1953).

27. See Fay v. Noia, 1963, 372 U.S. 391, 415–416, 83 S.Ct. 822, 9 L.Ed.2d 837.

28. Marshall v. Holmes, 1891, 141 U.S. 589, 12 S.Ct. 62, 35 L.Ed. 870; McDaniel v. Traylor, 1905, 196 U.S. 415, 25 S.Ct. 369, 49 L.Ed. 533; Simon v. Southern Railway, 1915, 236 U.S. 115, 35 S.Ct. 255, 59 L.Ed. 492; Public Service Co. of Northern Illinois v. Corboy, 1919, 250 U.S. 153, 39 S.Ct. 440, 63 L.Ed. 905; Wells Fargo & Co. v. Taylor, 1920, 254 U.S. 175, 41 S.Ct. 93, 65 L.Ed. 205; Chicago, R. I. & P. Ry. Co. v. Callicotte, 8 Cir. 1920, 267 F. 799; Griffith v. Bank of New York, 2 Cir. 1945, 147 F.2d 899, 160 A.L.R. 1340.

29. See Warren v. Connor, 5 Cir. 1966, 365 F.2d 590; Tolg v. Grimes, 5 Cir. 1966, 355 F.2d 92, cert. denied, 384 U.S. 988, 86 S.Ct. 1887, 16 L.Ed.2d 1005.

30. See United States v. Price, 1966, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed. 267; United States v. Guest, 1966, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239; Wilkins v. United States, 5 Cir. 1967, 376 F.2d 552.

31. See Monroe v. Pape, 1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492. But cf. Pierson v. Ray, 1967, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288.

Amsterdam, Criminal Prosecutions Affecting Federally Guaranteed Rights: Federal Removal and Habeas Corpus Jurisdiction To Abort State Court Trial, 113 U.Pa.L.Rev. 793, 842 (1965). It makes no difference that the state criminal proceedings may result in acquittal, or reversal of conviction upon appeal. Harassment "is worked, for the most part, not by final judgments of conviction but by mesne process. It can be stopped only by a federal [remedy] as broad as the evil itself." Amsterdam, supra at 909–10. Although the anticipatory remedies of removal [32] and habeas corpus [33] have been foreclosed, and post-conviction habeas corpus is often an illusory remedy,[34] the section 1971 injunction remains available at least in those voting cases the Government is willing to prosecute. Since section 1971 stands as a bulwark against harassing and coercive prosecutions, federal courts should construe it liberally to fulfill the protective aspect of American Federalism.

Section 1971(c) provides:

"Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b) of this section, the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order."

In construing the language "or other order" this Court has always been willing to tailor the remedy to fit the evil presented. We have borne in mind that it is our duty to eradicate the effect of past discrimination, as well as to insure against discrimination in the future. Louisiana v. United States, 1965, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709;[35] Bell v. Southwell, 5 Cir. 1967, 376 F.2d 659; Hamer v. Campbell, 5 Cir. 1966, 358 F.2d 215, cert. denied, 385 U.S. 851, 87 S.Ct. 76, 17 L.Ed.2d 79; United States v. Dogan, 5 Cir. 1963, 314 F.2d 767; cf. United States v. Jefferson County Board of Education, 5 Cir. 1966, 372 F.2d 836, en banc, 380 F.2d 385; Lee v. Macon County Board of Education, M.D.Ala. 1967, 270 F.Supp. 859 (3-judge).

Specifically, we have enjoined prosecutions. United States v. Wood, 5 Cir. 1961, 295 F.2d 772. We have temporarily frozen voter qualifications. United States v. Duke, 5 Cir., 1964, 332 F.2d 759; United States v. Ward, 5 Cir. 1965, 349 F.2d 795; United States v. Lynd, 5 Cir. 1965, 349 F.2d 785. We have ordered the registration of specified Negroes. State of Alabama v. United States, 5 Cir. 1962, 304 F.2d 583, aff'd, 1962, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112; United States v. Lynd, 5 Cir. 1965, 349 F.2d 790. We have enjoined poll tax requirements and ordered that nunc pro tunc payment be allowed. United States v. Dogan, 5 Cir. 1963, 314 F.2d 767. We have issued broad injunctions against economic coercion and intimidation. United States v. Bruce, 5 Cir. 1965, 353 F.2d 474. See also United States v. Beaty, 6 Cir. 1961, 288 F.2d 653; United States v. Deal, W.D.La.1961, 6 Race Rel. L.Rep. 474. We have set aside elections. Hamer v. Campbell, 5 Cir. 1966, 358 F.2d 215, cert. denied, 385 U.S. 851, 87 S.Ct. 76; Bell v. Southwell, 5 Cir. 1967, 376 F.2d 659. But see Mis-

32. City of Greenwood v. Peacock, 1966, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944.

33. Hillegas v. Sams, 5 Cir. 1965, 349 F.2d 859, cert. denied, 383 U.S. 928, 86 S.Ct. 927, 15 L.Ed.2d 847; Brown v. Rayfield, 5 Cir. 1963, 320 F.2d 96, cert. denied, 375 U.S. 902, 84 S.Ct. 191, 11 L.Ed.2d 143.

34. Harassment prosecutions may be based on infractions of minor laws, violations of which are punishable only by fines or jail sentences so short that habeas actions become moot before they can be decided.

35. "We bear in mind that the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." 380 U.S. at 154, 85 S.Ct. at 822.

sissippi Freedom Democratic Party v. Democratic Party of the State of Mississippi, 5 Cir. 1966, 362 F.2d 60. See also the broad injunction against private acts of coercion and intimidation issued in United States v. Original Knights of the Ku Klux Klan, E.D.La. 1965, 250 F.Supp. 330 (3-judge).

In State of Alabama v. United States, 5 Cir. 1961, 304 F.2d 583, aff'd, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112, we specifically noted the broad equity powers section 1971(c) conferred upon the federal courts. There we approved the district court's assumption of "a most detailed supervision of the day-to-day operation of voter registration." 304 F.2d at 585. Judge Brown, for the Court, said:

"Here the matter at stake is the fulfillment of a policy wrought out after extensive consideration of what Congress thought to be contemporary evils by States and agencies of States in the spurious, sometimes sophisticated, sometimes crude, practices by which Negroes were effectively denied the right to vote because of color and race alone. It was this evil which brought about the statute. It is inconceivable that in its enactment Congress meant by this broad language to grant less than effective judicial tools to combat it."

We agree with Judge Brown's analysis. It is inconceivable that the court, having found a precise evil against which Congress directed section 1971, should be powerless to remedy that evil.

Hamer v. Campbell, 5 Cir. 1966, 358 F.2d 215, is particularly in point. There Negroes in Sunflower County, Mississippi had systematically been denied the right to vote. The district court enjoined the registrar's discriminatory practices and entered a freeze order for a period of one year. Unfortunately for those Negroes who took advantage of the order and registered, the order came too late to allow them to take part in the forthcoming municipal election. A group of Negroes brought an action seeking to delay the election and to allow payment of the poll tax nunc pro tunc so that they would be eligible to participate. The district court denied relief, and this Court denied an injunction pending appeal. The election went off as scheduled, but on appeal this Court held that it should have been enjoined. Faced with the fait accompli of the election, the court chose the "drastic, if not staggering" [36] step of voiding the election rather than allowing the product of discrimination to continue its effect for four more years. The Court remanded to the district court "with instructions to set aside the election it should have initially enjoined". 358 F.2d at 217.

The present case is indistinguishable from *Hamer*. The government sought relief to which it was entitled, but because relief was not granted promptly, the prosecutions sought to be enjoined were carried to conclusion. "Our absence of facilities to rectify rapidly should not now prevent us according full relief * * *." Hamer v. Campbell, 358 F.2d at 222. If anything, this case presents a stronger case for relief than did *Hamer*. Setting aside a few criminal convictions is far less disruptive of the normal functioning of state government than is the voiding of an election. Compare Mississippi Freedom Democratic Party v. Democratic Party of the State of Mississippi, 5 Cir. 1966, 362 F.2d 60.

In order to grant full relief in this case, we must see that as far as possible the persons who were arrested and prosecuted in violation of section 1971(b) are placed in the position in which they would have stood had the county not acted unlawfully. Only in this manner may we be sure that the possibility of unlawful arrest and prosecution will not deter Negroes from participating in the voting process. See note 32 supra. Of course no court order can completely eradicate the effect of the country's actions. If nothing else remains, the mental anguish and the nuisance of having to defend

---

36. Bell v. Southwell, 5 Cir. 1967, 376 F.2d at 659.

baseless prosecutions could well deter Negroes from participating in the registration process. The Court can and must, however, do all within its power to eradicate the effect of the unlawful prosecutions in this case. We therefore hold that the district court should enter an order requiring the appropriate officials of Dallas County to return all fines, and to expunge from the record all arrests and convictions resulting from the prosecutions which form the basis for these suits. The individuals so prosecuted would not have had to bear the costs of their defense had these prosecutions been enjoined as they should have been. The district court's order should therefore include a requirement that the county reimburse the individuals involved for the costs, including reasonable attorneys' fees, incurred in the defense of the state criminal prosecutions.[37] The district court should take whatever additional action is necessary to return individuals to their status quo ante.[38]

## IV.

We turn next to the surveillance of the public meetings. The Government argues that the only possible reason for the presence of deputies at the meetings was to intimidate potential Negro voters. The defendants insist that they sent the deputies to the meetings solely to preserve order and to protect the Negroes.

We recognize that surveillance of meetings may tend to deter the exercise of federally guaranteed rights. N.L. R.B. v. Friedman-Harry Marks Clothing Co., 1937, 301 U.S. 58, 57 S.Ct. 645, 81 L.Ed. 921. We cannot agree with the government, however, that the defendants' explanation of the deputies' mere presence at the meetings was so incredible as to require the trial judge to draw the inference that the real motive was intimidation or coercion. In the explosive situation prevailing in Selma in 1963, it would have been a dereliction of duty for the county not to have provided law enforcement coverage of these mass meetings. While the presence of the deputies may have had an incidental coercive effect, there was evidence of a legitimate motive. We cannot find the district judge clearly erroneous on this score. Cf. United States v. Leflore County, 5 Cir. 1967, 371 F.2d 368.

## V.

The government advances two basic theories to support its position that the district court should have enjoined the Dallas County grand jury and the county officials acting in concert with it. First, it asserts that the grand jury had no authority to investigate the activities of the Justice Department, and that the enforcement of the subpoenas served on civil rights division lawyers should therefore be enjoined. As a sub-theory, it urges that the statements of county officials that the grand jury was investigating only violations of state law were afterthoughts, and that the real purpose of the investigation was the obstruction of the civil rights division's operation in Dallas County. Second, the government's second theory is that the entire grand jury investigation was designed to intimidate and coerce Dallas County Negroes for the purpose of interfering

---

37. In United States v. Clark, S.D.Ala. 1965, 249 F.Supp. 720, the court amended its injunction to provide relief of this same nature with regard to arrests and prosecutions which took place in 1964.

38. The Court in Hamer v. Campbell cautioned that: "This action does not mean that we necessarily would set aside every election in which a substantial number of citizens have been denied the right to vote. This is not a case where an election is challenged for the first time after it is held. Here appellants attempted to enjoin the election, and failing where they should have succeeded, they were diligent in seeking to have this failure rectified by our reversal prior to the election." 358 F.2d 215 at 222. Here, too, the government was diligent in pursuing its remedy. We therefore do not face the question whether relief such as that we order here may or should be granted when the government first attacks convictions or prosecutions long after they have become final. In Bell v. Southwell, 5 Cir. 1967, 376 F.2d 659, the Court noted that the Hamer caveat is not to be considered a mechanical rule. All that is required is reasonable diligence.

with their right to vote, and should therefore have been enjoined as a violation of section 1971(b).

The defendants urge that the grand jury investigation dealt only with violations of state law. They further contend that even if the investigation was beyond the scope of the grand jury's authority, the government lawyers were not immune from appearing and testifying. The proper method of testing the grand jury's authority, they claim, is by asserting a privilege to refuse to answer specific questions propounded by the jury.

A study of the record makes clear that the defendants' assertion that the investigation was to deal with violations of state law is a patent sham. At the outset, Defendant McLeod announced publicly that the principal business of the grand jury would be to investigate the role of the Justice Department in the racial unrest in the area, with particular regard to Dr. King's use of a car rented by the Department. Defendant Hare specifically charged the grand jury with regard to this incident. Only after this Court ordered that such investigation be restrained [39] did the theme change. Only then did the defendants proclaim that the investigation was limited to violations of state law.

We need list only the state "crimes" the defendants insist the grand jury was investigating to expose the feeble nature of their argument. The defendants seriously contend that the grand jury was going to inquire whether the government lawyers (1) consorted with, concealed and harbored known criminals and dope addicts; (2) consorted and associated with admitted sex perverts; (3) had any part in enticing children away from school during school hours to participate in street demonstrations in defiance of law; (4) acted in any manner contributing to the delinquency of minors; or

(5) participated in any manner in fomenting riots, insurrection, and civil disobedience. Defendant McLeod also informed the Department that the jury would investigate implications that Sheriff Clark had lied which were contained in Justice Department statements concerning the King incident.

The defendants introduced no evidence whatsoever to indicate even a scintilla of substance in these charges. The evidence is overwhelming that the purpose of the grand jury investigation was not to ascertain violations of state law, but rather to harass and obstruct the operations of the Justice Department in Dallas County, Alabama. We hold that the trial court's finding to the contrary that the investigation was initiated and carried out in good faith was clearly erroneous.

Both the Supremacy Clause and the general principles of our federal system of government dictate that a state grand jury may not investigate the operation of a federal agency. See Martin v. Hunter's Lessee, 1816, 1 Wheat. 304, 4 L.Ed. 97; Tarble's Case, 1872, 13 Wall. 397, 20 L.Ed. 597; State of Tennessee v. Davis, 1880, 100 U.S. 257, 25 L.Ed. 648; United States v. Owlett, M.D.Pa. 1936, 15 F.Supp. 736; Warren, Federal and State Court Interference, 43 Harv. L.Rev. 345 (1930); Note, Limitations on State Judicial Interference with Federal Activities, 51 Colum.L.Rev. 84 (1951).

United States v. Owlett, supra, is most closely in point. There a committee of the Pennsylvania State Senate, fearing that the local unit of the Works Progress Administration was building a political machine rather than working for the alleviation of unemployment, set up a committee to investigate the WPA. The United States brought an action to enjoin the investigation. Finding that "[t]he investigation by the [committee] is an interference with the proper gov-

---

39. In the *McLeod* case, the district court refused to grant a temporary restraining order. On immediate appeal, we reversed. The district court dissolved the restraining order when, after the hearing, it denied relief. Although the district court denied an injunction pending appeal, the grand jury has apparently taken no further action in the matter.

ernmental function of the United States," 15 F.Supp. at 741, the Court granted the injunction. The district judge said:

"The attempt by the respondents, a committee appointed by the Senate of a sovereign state, to investigate a purely federal agency is an invasion of the sovereign powers of the United States of America. If the committee has the power to investigate under the resolution, it has the power to do additional acts in furtherance of the investigation; to issue subpoenas to compel the attendance of witnesses and the production of documents, and to punish by fine and imprisonment for disobedience. When this power is asserted by a state sovereignty over the federal sovereignty, it is in contravention of our dual form of government and in derogation of the powers of the federal sovereignty. The state having the power to subpoena may abuse that power by constantly and for long periods requiring federal employees and necessary federal records to be before an investigating committee. This power could embarrass, impede, and obstruct the administration of a federal agency. * * * No federal agency can properly function if its employees are being constantly called from their duties; if its records are constantly kept from official use; if its employees are subjected to illegal fine and imprisonment." United States v. Owlett, 15 F.Supp. 736, 743.

The interference of a state grand jury is just as intolerable as that of a state legislative committee. For the reasons stated in *Owlett*, we hold that the United States was entitled to an injunction against the grand jury's investigation. See also Pennsylvania Turnpike Comm'n v. McGinnes, E.D.Pa.1959, 179 F.Supp. 578, aff'd, 3 Cir. 1960, 278 F.2d 330, cert. denied, 364 U.S. 820, 81 S.Ct. 57, 5 L.Ed.2d 51.[40]

The defendants' argument that the individuals subpoenaed must assert a privilege against answering specific questions is without merit. First, merely calling employees of the federal government before the grand jury would have the proscribed disruptive effect on the administration of a federal agency. As the court said in Owlett, 15 F.Supp. at 743:

"The suggestion that federal employees could refuse to obey the subpoenas, or seek relief by habeas corpus from imprisonment for disobedience, is no relief. Although these remedies might in a measure protect the individuals, they do not in any degree protect the United States of America from an invasion of its sovereignty or from vexatious interruptions of its functions."

Second, the only method in which the validity of the claimed privilege could be determined would be by proceedings in the state court of which the grand jury was an arm, with review in the state courts and finally the Supreme Court of the United States. This is a totally unsatisfactory method of protecting the sovereignty of the United States. Such matters are, by their very nature, for prompt determination by the federal courts.

The issue is not one of privilege to refuse to answer certain questions. The issue is the validity of the entire investigation. If the entire investigation is invalid, as we have determined this one to be, it would be futile to require witnesses to appear and claim privilege with regard to each question.

## VI.

The defendants urge that this case is moot. They point out that since the trial of these cases: 1) A three-judge court in United States v. Clark, S.D.Ala. 1965, 249 F.Supp. 720, has enjoined county officials from engaging in various

---

40. N.L.R.B. v. Capitol Fish Co., 5 Cir. 1961, 294 F.2d 868, on which the defendants rely, has no bearing on this case. We based our decision there explicitly on the ground that "exclusion of the investigating attorney as a witness violated *the statutory provisions* governing proceedings under the Act."

coercive acts, including arresting and prosecuting persons seeking to exercise the right to vote; 2) federal registrars have registered more than 10,000 Negroes to vote in Dallas County; 3) Sheriff Clark was not re-elected in November 1966; 4) the grand jury which had undertaken the invalid investigation of the Justice Department has been dismissed and replaced by a grand jury with eight Negro members. While these events do indicate that the situation in Dallas County has improved in the last four years, we do not think they render the case moot. See United States v. Atkins, 5 Cir. 1963, 323 F.2d 733, 739. Certainly with regard to expungement of convictions and return of fines, the case is not moot. Nor does the mere cessation of unlawful activity render a case moot. United States v. W. T. Grant Co., 1953, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303.

Nevertheless the Government concedes that in light of the *Clark* case, supra, and in light of the various changes in the situation in Dallas County, less than all the relief requested in the trial court may now be necessary. We hesitate to determine just what relief must now be granted, particularly on this record which is, to say the least, stale. We therefore reverse the judgments of the district court and remand the cases to that court for the grant of such relief as we have ordered and a hearing to determine the scope of any further relief which may be necessary at this time.

The judgments of the district court are reversed, and the cases are remanded with directions.

BELL, Circuit Judge (concurring specially):

No one, not even the defendants, could doubt that the arrests and prosecutions here involved were designed to interfere with the rights of Selma and Dallas County Negroes to the franchise. The District Court, as the majority points out in a particularly learned and comprehensive opinion, fell into error in its approach. The questions presented should have been determined from the overall viewpoint of 42 U.S.C.A. § 1971(b), which proscribes such interference. I concur in the holdings that the trial court erred in failing to find on the facts that the conduct of the defendants threatened, intimidated and coerced, prospective Negro voters and was for the purpose of interfering with their right to vote. It follows that adequate relief necessitates expunging the arrests and/or convictions which form the basis of these suits from the state records. All fines and costs paid must be refunded and all defense costs including attorneys' fees incurred in the defense of the criminal prosecutions must be reimbursed. I also concur in the disposition of the grand jury and surveillance questions.

The grand jury investigation was improper in view of federal sovereignty as it exists in our dual system of government. The state had no right to investigate the activities of the Justice Department. This question was settled by the Founding Fathers on the formation of the Union and the adoption of the Supremacy Clause.